UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
UNITED STATES OF AMERICA,                    :
                                             :
              -against-                      :
                                             :        **OPINION AND ORDER**
SYED IMRAN AHMED,                            :        14-cr-277 (DLI)
                                             :
                            Defendant.       :
---------------------------------------------------------------x

**DORA L. IRIZARRY, Chief Judge:**

On May 12, 2014, a grand jury within the Eastern District of New York returned a six-count indictment charging defendant Dr. Syed Imran Ahmed ("Defendant") with health care fraud (Count One), false statements relating to health care matters (Counts Two through Four), and money laundering (Counts Five and Six). Indictment, Dkt. Entry No. 22, at ¶¶ 17-22. On February 5, 2016, the parties filed the first set of motions *in limine*. Defendant's First Motion *in Limine* ("Def. Fir. Mot."), Dkt. Entry No. 91; Government's First Motion *in Limine* ("Gov't. Fir. Mot."), Dkt. Entry No. 93. On June 10, 2016, the parties filed the second set of motions *in limine*. Defendant's Second Motion *in Limine* ("Def. Sec. Mot."), Dkt. Entry No. 124; Government's Second Motion *in Limine* ("Gov't. Sec. Mot."), Dkt. Entry No. 122. Unless otherwise indicated, this Opinion and Order addresses the first set of motions.

In its motion, the government seeks: (1) to preclude Defendant from asserting a "blame the victim" defense; (2) advance notice of any defense witnesses that reside in a foreign country or exhibits obtained from a foreign country; and (3) to admit evidence of uncharged fraud allegedly committed by Defendant. Gov't. Fir. Mot. at 1. Defendant consents to the second request (advance notice) and opposes the other two. Defendant's Opposition to the Government's First Motion *in Limine* ("Def. Op. Gov't. Fir. Mot."), Dkt. Entry No. 96, at n.1. In the Defendant's motion, he seeks to: (1) preclude the evidence of uncharged fraud that the government seeks to admit in its

1

motion; (2) preclude evidence that Defendant's wife sent $1,000,000 via wire transfer to a bank account in Pakistan in Defendant's name; (3) preclude evidence that Defendant's billing was disproportionately higher than other Medicare providers; (4) preclude evidence that Defendant's billing "spiked" in 2011; and (5) compel the government to specify which claims and patients it intends to rely on at trial other than the 23-25 patients the government will focus on at trial (the "Featured Patients"). *See generally*, Def. Fir. Mot. The government consents to the fifth request (identification of additional claims and patients)[1] and opposes the first four. Government's First Opposition to Defendant's First Motion *in Limine* ("Gov't. Op. Def. Fir. Mot."), Dkt. Entry No. 97, at 1.

For the reasons set forth below, the government's motion is granted in its entirety.[2] Defendant's motion is granted in part and denied in part, as follows: (1) evidence of the wife's $1,000,000 wire transfer is admitted; (2) evidence of Defendant's disproportionate billing is admitted partially;[3] and (3) evidence that Defendant's billing spiked in 2011 is admitted partially.[4]

---

[1] Despite this concession, in Defendant's second motion *in limine*, he maintains that the government still has not provided sufficient detail regarding certain claims and patients outside of the 23-25 Featured Patients the government will focus on during its case-in-chief. Def. Sec. Mot. at 6-9. Defendant's arguments from his first motion are substantially similar to the arguments he makes in his second motion regarding this issue, *i.e.* lack of notice, unfair surprise, and inability to prepare his defense. *Compare Id.*, *with* Def. Fir. Mot. at 6-7. Accordingly, the Court will take up these issues in a separate opinion and order addressing the second set of motions *in limine*.

[2] Because the government's motion is granted in its entirety, Defendant's request to preclude evidence of uncharged fraud necessarily is denied.

[3] Only the number of claims is admitted; the amount Medicare reimbursed Defendant and the other providers is excluded. Moreover, the disproportionate claims evidence is admitted solely for the purpose of showing Defendant did not perform the surgeries at issue; it is excluded for the purpose of demonstrating his intent. Appropriate limiting instructions will be given to the jury in this regard.

[4] Only the number of claims is admitted; the amount Medicare reimbursed Defendant for these claims is excluded. However, unlike the disproportionate billing evidence, the evidence of a spike is admitted as proof that Defendant did not perform the surgeries *and* as proof that he acted intentionally. If necessary, appropriate limiting instructions will be given to the jury.

# BACKGROUND

Defendant is a general surgeon accused of defrauding Medicare, a federal health care program for individuals aged 65 or older. Medicare reimburses doctors for the cost of providing medical services to program beneficiaries. To apply for reimbursement, doctors submit claims that include certain information about the beneficiary and the services rendered. The medical services listed in these claims are identified by billing codes known as Current Procedural Terminology or "CPT" codes.

For surgeries, Medicare reimburses doctors for the "global surgical package," which includes not only the surgery itself, but any medical care incidental to the surgery, such as pre- and post-operative visits, pain management, and dressing changes. Most incidental medical services are considered part of the global surgical package if performed during a specified length of time called the "global period." Rather than reimburse doctors for each of these medical services separately, Medicare makes one lump-sum payment for the entire global surgical package. However, unplanned trips to the operating room caused by complications from the surgery are individually reimbursable, even if they occur during the global period. Doctors submit claims with the modifier code "78" to indicate that a given procedure was performed during an unplanned trip to the operating room.

The government alleges that Defendant perpetrated a fraud against Medicare as follows. From January 1, 2011 to December 31, 2013, Defendant billed Medicare approximately $85 million for two categories of procedures, wound debridement procedures and incision-and-drainage procedures.[5] Medicare paid $7.3 million for these claims, many of which Defendant

---

[5] These procedures, and their associated CPT codes, are identified in greater detail in paragraph 8 of the indictment. Indictment at ¶ 8.

submitted with the modifier code 78 to indicate that the underlying procedures occurred as part of an unplanned trip to the operating room. The government asserts that many of these claims were false, as the procedures either did not occur under unplanned circumstances or were never performed at all. In some instances, Defendant purportedly billed Medicare for multiple procedures on the same patient on the same day for several days in a row. The government claims that Defendant's ubiquitous use of the 78 modifier code enabled him to bill for these excessive procedures that otherwise were not reimbursable under the global surgical package.

## DISCUSSION

I. **The Government's Motion** *in Limine*

A. *The "Blame the Victim" Defense*

The government believes Defendant may argue that Medicare was aware of potential problems with Defendant's billing and negligently reimbursed the claims at issue. The government moves to preclude Defendant from advancing this so-called "blame the victim" defense on the ground that Medicare's alleged negligence is irrelevant. Moreover, according to the government, certain beneficiaries submitted complaints to Medicare after they received explanation of benefits forms ("EOBs") for procedures Defendant never performed. The government notes that one of the complaints, submitted by a beneficiary identified as J.D., was ultimately resolved in Defendant's favor following an investigation. The government seeks to exclude this evidence as well, arguing that the investigator who reviewed J.D.'s complaint mistakenly concluded that Defendant's billing was proper.

In his response, Defendant does not contest the exclusion of the negligence argument or the results of the J.D. complaint investigation. Instead, Defendant argues that evidence of Medicare's payments to Defendant should be admitted as relevant to the question of whether he

acted with the requisite intent.  Defendant seeks to assert at trial that he subjectively believed his billing practices were proper, in part because Medicare continued to pay his claims "without any notice or indication of its objection."  Def. Op. Gov't. Fir. Mot. at 3.  The government urges the Court to reject Defendant's theory.

The Second Circuit follows the well settled rule that a defendant charged with a fraudulent scheme may not assert as a defense the victim's negligent failure to discover the fraud.  *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (citing cases from other circuits for the proposition that victim negligence is not a defense to criminal conduct); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (upholding district court's decision neither to charge the jury nor allow the defendant to argue "that it is a defense to mail fraud to demonstrate that the victim could have discovered based on external sources that the representation was false").  The rationale for these decisions is that a victim's "lack of sophistication" is irrelevant to the issue of whether the defendant acted intentionally.  *Amico*, 486 F.3d at 780; *see also Thomas*, 377 F.3d 232 at 242-43 ("[T]he victim's gullibility . . . is not relevant to the inquiry as to whether the defendants were properly convicted.").

Here, Defendant attempts to distinguish this line of cases by arguing that he does not seek to establish Medicare's negligence *per se* as a defense.  However, by arguing that Medicare paid Defendant "without alerting him that it believed the claims to be improper," Defendant essentially asserts that Medicare *either should have* stopped paying Defendant's claims or notified him of its concerns.  Def. Op. Gov't. Fir. Mot. at 3.  In other words, Defendant asserts that Medicare was negligent in handling his claims.  This negligence, he insists, led him to believe his claims were proper, and this innocent belief evidences a lack of criminal intent.  Construed thusly, this argument is nothing more than a repackaged version of the argument expressly prohibited by the

cases cited above, *i.e.*, victim negligence negates fraudulent intent. *See Thomas*, 377 F.3d at 243 (rejecting the "argument that the foolishness of [the victim's] belief in [the defendant's] fraudulent scheme somehow vitiates [the defendant's] *fraudulent intent*") (emphasis added); *Id.* (quoting *United States v. Coyle*, 63 F.3d 1239, 1243-44 (3d Cir.1995) ("[The] negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."); *see also Amico*, 486 F.3d at 780 ("[A] victim's lack of sophistication is not relevant to the *intent element* of mail or wire fraud.") (emphasis added). Accordingly, the Court finds Defendant's attempt to distinguish his argument unpersuasive.

Similarly, Defendant's citation to three district court cases from outside this Circuit is unconvincing. In two of these cases, the court denied the government's motion *in limine* where the evidence the defendant sought to admit potentially was relevant to the issue of *materiality*. *United States v. Kistner*, 2013 WL 80255, at *7-8 (S.D. Ohio Jan. 7, 2013) (permitting "blame the victim" evidence because the "the actions or inactions of the various [victims] could be probative of the issue of materiality"); *United States v. Babajian*, 2009 WL 412333, at *5 (C.D. Cal. Feb. 17, 2009) (same). Here, as Defendant adamantly maintains that Medicare's behavior is relevant to his *intent*, these cases are inapposite. In the third case cited by Defendant, *U.S. v. Battles*, 2012 WL 2087397 (W.D. Okla. June 8, 2012), the court admitted evidence of the victim bank's mortgage lending practices as relevant to a narrow and somewhat convoluted issue related to the defendant's intent. *Id.* at *1. However, because the rationale supporting admission of this evidence was confined to the unique facts of that particular case, the precedential weight of *Battles*, a non-binding decision from a court of concurrent jurisdiction, is limited. Moreover, *Battles* expressly re-affirmed the "settled" principal that the "negligence of a fraud victim in failing to discover the fraudulent scheme is not a defense to a fraud charge." *Id.* (citations omitted).

Finally, both parties also discuss, at some length, a decision from this District, which found no "legal authority to suggest that th[e] rule [prohibiting evidence of a victim's negligence] does not apply when Medicare and/or Medicaid, rather than an individual, are the victims of the fraud." *United States v. Nekritin*, 2011 WL 2462744, at *7 (E.D.N.Y. June 17, 2011). In *Nekritin*, the defendants were charged with health care fraud for submitting claims to Medicare and Medicaid for procedures that were not medically necessary and were not provided to the beneficiaries. *Id.* at *1. The government moved to preclude the defendants from: (1) asking witnesses about how Medicare and Medicaid investigated the defendants' claims before paying them; (2) arguing that Medicare and Medicaid were at fault for not denying the defendants' claims; and (3) "arguing that by paying prior claims of a similar nature, Medicare and Medicaid led the defendants to believe their billings under [the relevant CPT code] were acceptable." *Id.* at *6. The defendants argued that, because Medicare audited and provided education to providers, its conduct was relevant to the issue of the defendants' intent. *Id.* The defendants also sought to argue that an audit report prepared by Medicare, which suggested that Medicare had reviewed and "allowed" some of the defendants' false claims, was "exculpatory." *Id.* The *Nekritin* court rejected the defendants' arguments, holding that "Medicare's negligence in failing to discover the fraud at that time is not a defense and therefore such evidence is neither 'exculpatory' nor relevant to the issues in the instant case." *Id.* at *7.

Defendant maintains that *Nekritin* "did not address the question at issue here – whether evidence concerning the payment by Medicare and Medicaid of . . . [D]efendant's claims was relevant to his state of mind." Def. Op. Gov't. Mot. Dis. (citing *Nekritin*, 2011 WL 2462744, at *6-7). This assertion is simply wrong on its face. As noted above, one of the issues in *Nekritin* was whether the defendants could argue "that by paying prior claims of a similar nature, Medicare

and Medicaid led the defendants to believe their billings . . . were acceptable." *Nekritin*, 2011 WL 2462744, at *1. The court unambiguously held they could not: "the court precludes defendants from arguing or presenting evidence that Medicare and Medicaid's payment of their claims is a defense to health care fraud." *Id.* at *7. Thus, contrary to Defendant's unfounded claim that *Nekritin* "did not address the question at issue here," the Court finds that it expressly considered, and rejected, the very argument now advanced by Defendant.

Accordingly, Defendant may not argue that he did not intend to defraud Medicare because Medicare paid his claims, negligently or otherwise. Of course, the burden remains with the government to affirmatively prove Defendant acted intentionally, and nothing in this opinion prohibits Defendant from arguing, through admissible evidence, that he mistakenly over-billed Medicare. Finally, Defendant is granted leave to request that the Court revisit this ruling, if he can articulate a reason for admitting evidence of Medicare's negligence other than on the issue of Defendant's intent. *Id.* at *7 (permitting defendants to revisit the court's decision if they could "articulate a reason why such evidence is relevant").

(B)     *Evidence that Defendant Defrauded Private Insurers*

A number of the Medicare beneficiaries for whom Defendant allegedly submitted fraudulent claims are expected to testify at trial on behalf of the government. According to the government, these beneficiaries will testify that Medicare did not cover the total amount of Defendant's claims, the outstanding portions of which the beneficiaries paid for through supplemental private insurance. The beneficiaries will further testify that they discovered that Defendant billed for unperformed surgeries when they received EOBs from their private insurer. The government seeks to admit the beneficiaries' anticipated testimony along with the EOBs. Thus, the government moves to admit evidence that Defendant defrauded private insurers, criminal

conduct which is not charged in the indictment. Defendant urges the Court to exclude this evidence under Rule 404(b) of the Federal Rules of Evidence.

Rule 404(b)(1) states that "[e]vidence of a crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed.R.Evid. 404(b)(1). However, under subsection (b)(2) "this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at (b)(2). With respect to other crimes evidence, the Second Circuit follows "an inclusionary rule," under which district courts may admit other crimes evidence "for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *Carboni*, 204 F.3d at 44. However, "this inclusionary approach does not invite the government 'to offer, carte blanche, any prior act of the defendant in the same category of crime.'" *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (quoting *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir.2002) (additional citations omitted)).

Rule 404(b) does not necessarily apply to all uncharged prior bad acts. In the Second Circuit, "[e]vidence of uncharged criminal activity is not considered other crimes evidence under [Rule] 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir.1997)); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (first quoting *United States v. Towne*, 870 F.2d 880, 886 (2d Cir.1989); then quoting *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("[U]ncharged crime

evidence . . . necessary to 'complete the story of the crime on trial,'" is "appropriately treated as 'part of the very act charged,' or, at least, proof of that act.")).  Courts have admitted evidence of uncharged conduct in a variety of contexts on the ground that such conduct was not subject to Rule 404(b).  *See e.g.*, *Carboni*, 204 F.3d at 44 (evidence that defendant fabricated inventory to make his company appear financially sound inextricably intertwined with the charged conduct of knowingly making false statements to secure a line of credit from the victim bank); *United States v. Curley*, 639 F.3d 50, 58-59 (2d. Cir. 2011) (evidence that husband previously abused wife inextricably intertwined with interstate stalking charge); *United States v. Robinson*, 702 F.3d 22 (evidence that defendant engaged in prostitution-related activity "necessary to complete the story" of defendant's child sex trafficking charge).

The government contends that evidence of Defendant's fraud against the private insurers is inextricably intertwined with his scheme to defraud Medicare.  Defendant's response to this argument is confined to a single footnote in which he unsuccessfully attempts to distinguish this case from *Carboni*.  Def. Op. Gov't. Fir. Mot. at n.3.  The Court agrees with the government.

Defendant is charged with submitting claims to Medicare for surgeries he did not perform. The beneficiaries' anticipated testimony and the associated EOBs purportedly will show that Defendant submitted claims to private insurance providers *for the exact same procedures.* Accordingly, Defendant's private insurance claims are not other crimes evidence under any of the three approaches described in *Carboni*.

First, the evidence is admissible under the "transactional" prong, as the "transaction" in this instance was Defendant's attempt to obtain *complete* reimbursement of the allegedly non-performed surgeries.  Thus, the private insurance claims "arouse out of the same transaction[s]" as the charged offense, the allegedly fraudulent claims submitted to Medicare.  Second, the private

insurance claims are inextricably intertwined with the Medicare claims, because Defendant billed both insurance providers for the same surgeries. Finally, the beneficiaries are expected to testify that they only became aware of the fact that Defendant billed for non-performed surgeries when they received the EOBs from their private insurers. The explanation for how this alleged fraud was uncovered certainly is "necessary to complete the story of the crime on trial."

The Court further agrees with the government that, even if the evidence were subject to Rule 404(b), it would be admissible under subsection (b)(2) to show intent or lack of mistake. Defendant purportedly will argue at trial that he did not act knowingly or willfully because he mistakenly submitted incorrect claims to Medicare. Thus, the question of Defendant's intent squarely will be at issue.[6] The Second Circuit has held that, "[w]here [other crimes] evidence is offered for the purpose of establishing the defendant's knowledge or intent, . . . the government [must] 'identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act.'" *McCallum*, 584 F.3d at 475 (quoting *Garcia*, 291 F.3d at 137) (additional citations omitted); *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011) (quoting *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir.1987) ("When 'other act' evidence is offered to show knowledge or intent in particular, as opposed to other non-propensity purposes such as proof of identity or corroboration of witnesses, such evidence must be 'sufficiently similar to the conduct at issue' to permit the jury to draw a reasonable inference of knowledge or intent

---

[6] Normally, "if [other acts] evidence is offered to prove the defendant's knowledge or intent, the offer of similar acts evidence should await the conclusion of the defendant's case and should be aimed at a specifically identified issue." *United States v. Colon*, 880 F.2d 650, 660 (2d Cir. 1989) (quoting *United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir. 1980)). However, the Circuit "ha[s] recognized an exception to this general rule in cases where there was no doubt that the issue of intent would be disputed in the case." *Id.* (citing *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir.1987) (additional citation omitted). Here, Defendant unambiguously states that his intent will be "a key issue that will be in dispute at trial." Def. Fir. Op. at 2; *Id.* at 3 (Defendant's intent "will be a principle [*sic*] issue in this case."). Therefore, because the exception applies, the Court will decide the admissibility of other acts evidence pertaining to Defendant's intent before trial.

from the other act."). Here, the government has established a "connection" between the private insurance claims and the Medicaid claims by virtue of the fact that the same surgeries supported both sets of claims. Thus, evidence that Defendant submitted the same claims to Medicare and private insurance providers tends to undermine the assertion that improprieties with his Medicare billing were inadvertent.

Defendant alternatively claims that this evidence is inadmissible because it is irrelevant under Rules 401 and 402, and further, because it is more prejudicial than probative under Rule 403. Both arguments lack merit. The evidence is both relevant and probative for all of the reasons discussed above. Moreover, the prejudicial effect of this evidence will be minimal. No doubt Defendant will be prejudiced by the fact that the jury will learn that he billed Medicare for procedures he did not perform. However, any further prejudice that results from the jury learning that he billed another insurer for these same procedures is outweighed by the evidence's probative value. Finally, because the evidence is relevant to Defendant's intent, an issue that Defendant himself has placed in dispute, any resulting prejudice is not unfair. *Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174 (2d Cir. 2000) (citing *Weinstein's Federal Evidence* § 403.04[1][a] (2d ed.1997) (emphasis in original) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*."); *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir.2006) ("Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.").

### (C)    Evidence that Defendant Submitted Claims to Medicaid

The government moves to admit evidence that Defendant billed Medicaid for incision-and-drainage procedures and wound debridement procedures on behalf of a particular beneficiary (the

"Medicaid Beneficiary"). As a threshold matter, the government's proffer regarding this evidence is confusing and requires clarification. In its opposition to Defendant's motion, the government notes that "no claims were submitted to Medicare for th[e] [Medicaid] [B]eneficiary." Gov't. Op. Def. Fir. Mot. at n.2. However, the government also states that "bills which . . . Defendant submitted to Medicare were also, at times, submitted . . . *to Medicaid* . . . ." *Id.* at 2 (emphasis added). Unless there are other beneficiaries for whom Defendant submitted claims to Medicare and Medicaid, these statements are irreconcilable; either the Medicaid Beneficiary's claims were also submitted to Medicare or they were not.

The resolution of this issue is dispositive. If Defendant billed Medicare and Medicaid for the same procedures, similar to the manner in which he billed private insurers to reimburse costs not covered by Medicare, then the analysis above regarding the claims submitted to the private insurers applies. In this case, the Medicaid claims arise "out of the same transaction" as the Medicare claims, are "inextricably intertwined with" the Medicare claims, and are "necessary to complete the story" of the Medicare fraud scheme. *Carboni*, 204 F.3d at 44.

However, if Defendant submitted the Medicaid Beneficiary's claims to Medicaid *only*, then evidence that Defendant potentially defrauded Medicaid, without further explanation, is inadmissible character evidence under Rule 404(b). The government's rote recitation of the exceptions listed under subsection (b)(2) sheds no light on *why* the Medicaid evidence demonstrates Defendant's "intent, preparation, plan, knowledge, . . . absence of mistake, or lack of accident." Government's Reply to Defendant's Opposition ("Gov't. Fir. Rep."), Dkt. Entry No. 103, at 4. As previously noted, where the government alleges that a defendant's prior bad act demonstrates an intent to commit the crime charged, it is the government's burden to "identify a similarity or connection between the two acts that makes the prior act relevant to establishing

knowledge of the current act." *McCallum*, 584 F.3d at 475. Here, the Medicaid claims are similar to the Medicare claims in that they were both submitted during the period alleged in the indictment and they both involved billing a government program for certain types of procedures. However, the government fails to explain how these superficial similarities demonstrate that Defendant knowingly submitted false claims to Medicare. *See United States v. Levy*, 731 F.2d 997, 1004 (2d Cir. 1984) ("[I]t is not inconceivable that acts or crimes that occur almost contemporaneously with the indicted crime may be entirely unrelated to that crime. To allow the admission of evidence of crimes or acts unrelated to the charged offense presents the precise threat of prejudice that Rule 404(b) was designed to eliminate.").

The Second Circuit's decision in *Cadet* is instructive. In that case, the defendant was convicted of aiding and assisting the preparation of false federal tax returns. *Cadet*, 664 F.3d at 29. The defendant claimed that he did not willfully prepare false returns on behalf of his clients, arguing that he relied on inaccurate information provided by the clients or he made mistakes. *Id.* at 30. The government sought to introduce evidence of interactions between the defendant and an undercover agent with the Internal Revenue Service ("IRS") in which the defendant proposed to employ "creative financing" to obtain a fraudulent refund for the agent in exchange for a higher fee. *Id.* Because the defendant contested the willfulness of his conduct, the district court admitted the evidence under 404(b) as relevant to motive, intent, corroboration and absence of mistake. *Id.*

The Second Circuit found that the district court did not abuse its discretion by admitting the evidence. *Id.* at 33. It held:

> Evidence of other acts need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b), so long as the evidence is relevant in that it provides a reasonable basis for inferring knowledge or intent. Similarity, being a matter of relevancy, is judged by the degree in which the prior act approaches near identity with the elements of the offense charged. There is no necessity for synonymity but there must be *substantial* relevancy.

*Id.* at 32-33 (internal quotation marks and citations omitted) (emphasis in original).

*Cadet* further noted that the defendant's conduct with the IRS agent was not identical to the charged conduct of preparing false tax returns for his other clients. *Id.* at 33. However, because the other acts evidence and the charged conduct were "sufficiently similar," the other acts evidence was relevant to the defendant's knowledge and intent. *Id.* In particular, *Cadet* relied on the fact that the defendant acted knowingly and intentionally in preparing the IRS agent's false tax return.[7] *Id.* This evidence was essential to the court's holding, because it "provided a reasonable basis to infer that the inflated deductions that formed the basis for the 16 counts of conviction were likewise entered knowingly and intentionally." *Id; see also Garcia*, 291 F.3d at 137 (in a narcotics conspiracy case, district court abused its discretion in admitting defendant's prior drug conviction where the only similarity between the prior drug conviction and the charged crime was that they both involved cocaine; as such, there was no basis to infer from the prior drug conviction that the defendant possessed knowledge of code words used in furtherance of the narcotics conspiracy).

Here, the government simply states, in conclusory fashion, that the Medicaid evidence is relevant to the question of whether Defendant intentionally defrauded Medicaid. While the Medicaid claims need not be identical to the Medicare claims to be relevant of this issue, the similarities between these claims are too tenuous to support admissibility under 404(b). Unlike *Cadet*, in this case the government has not presented evidence that Defendant acted knowingly and intentionally with respect to the other acts evidence, *i.e.*, the claims submitted to Medicaid. Thus, there is no "reasonable basis to infer" from the Medicaid evidence that the Medicare claims were

---

[7] The defendant initially calculated that the agent's tax liability was $3,000. *Id.* at 30-31. When the agent advised the defendant that he could not afford to pay that amount, the defendant offered to use "creative financing" in exchange for a higher fee. *Id.* at 31. The defendant then artificially increased the agent's deductions on Form 1040, which generated a refund of $2,458. *Id.*

submitted with knowledge of their falsity. As such, the Medicaid claims are not relevant, and are excluded unless and until the government can demonstrate that Defendant submitted them with a fraudulent intent.

## II.    Defendant's Motion *in Limine*

### (A)    The $1,000,000 Wire Transfer by Defendant's Wife

The indictment charges Defendant with two counts of money laundering based on transactions involving Defendant's domestic TD Bank account ending in 5668 (the "5668 Account"). Indictment, at ¶¶ 21-22. Count Five alleges that Defendant wired $1,000,000 from the 5668 Account to an account in his name in the United Arab Emirates ("UAE").[8] *Id.* at ¶ 21. Count Six charges that Defendant deposited a check for $1,000,000, drawn on the 5668 Account, into a different domestic TD Bank account controlled by Defendant ending in 8506 (the "8506 Account").[9] *Id.* at ¶¶ 22. The indictment further alleges that Medicare reimbursed Defendant's fraudulent claims by depositing funds into the 5668 Account. *Id.* at ¶ 16.

The government intends to introduce evidence that Defendant's wife transferred $1,000,000 from a jointly held domestic Commerce Bank account ending in 4999 (the "4999 Account") to a bank account in Pakistan in Defendant's name (the "Additional Transfer"). The Additional Transfer occurred on the same date as the Counts Five and Six Transfers, September 9, 2013. Law enforcement agents questioned Defendant about the Medicare scheme a few days prior to this date. The indictment does not allege that Defendant used the 4999 Account in

---

[8] In the government's opposition, it states that Defendant wired this money to a bank account in Pakistan. Gov't. Op. Def. Fir. Mot. at 3 ("Count Five relates to at $1 million wire transfer that . . . [D]efendant sent from [a] domestic TD Bank account to an account in his name at a bank in Pakistan. . . ."); *Id.* at 4 ([The government] will also argue that the first money transfer – a wire transfer to Pakistan – specifically shows his preparations to flee the country to avoid prosecution."). The analysis is the same despite this inconsistency, which the government must resolve before trial.

[9] The Court refers to these transactions as the "Count Five Transfer" and the "Count Six Transfer," respectively.

connection with any of the crimes charged. *See generally*, Indictment.

The government asserts that the Counts Five and Six Transfers are relevant under a variety of theories: (1) as direct evidence of the money laundering charges; (2) as proof that Defendant sought to shield these funds from recoupment by the government; and (3) with respect to the Count Five Transfer to the UAE, as evidence of Defendant's consciousness of guilt and preparations to flee the country. The government seeks to admit the Additional Transfer under the theory that it further evidences Defendant's consciousness of guilt. Defendant opposes admission of the Additional Transfer, arguing that it has little probative value because it had "nothing to do with the crimes charged." Def. Fir. Mot. at 4. Moreover, Defendant views this evidence as highly prejudicial, because the location of the transferee bank in Pakistan might improperly influence jurors who "harbor biases against Muslims or persons of Middle Eastern descent." *Id.* at 4-5. In response, the government states that it will redact any mention of Pakistan from the Count Five Transfer and the Additional Transfer. In his reply, Defendant states that, because the government can use the Count Five Transfer to argue Defendant's intent to flee, the probative value of the Additional Transfer is diminished.

As an initial matter, Defendant's juror bias argument is somewhat disingenuous, given that this concern was raised and addressed in the context of Defendant's proposed jury questionnaire. At the hearing dated January 29, 2016, the Court explained that, because of the nature of this case, there should be no need to mention Defendant's religion or nationality before the jury. The government agreed. In its response to Defendant's motion, it has agreed, yet again, to refrain from needlessly informing the jury that Defendant is of Pakistani descent.[10] The Court

---

[10] The government proposes to redact the mention of Pakistan from the Additional Transfer. Instead, the government will inform the jury that the wife sent the Additional Transfer to Defendant's country of birth from which extradition is difficult.

is satisfied that any potential ethnic or religious bias toward Defendant has been sufficiently mitigated.

Defendant's arguments regarding the probative value of the evidence also are unavailing. It is simply false that the Additional Transfer had "nothing to do with the crimes charged." Def. Fir. Mot. at 4. While the 4999 Account did not house proceeds of the Medicare fraud, the Additional Transfer occurred on the same day as the Counts Five and Six Transfers. Either this timing is stunningly coincidental or, it suggests that the Additional Transfer was related to the transfers that are the subjects of the money laundering counts. Moreover, the fact that all three transfers occurred within days of when law enforcement first questioned Defendant further increases the probative value of the Additional Transfer concerning Defendant's consciousness of guilt. While this probative value may be diminished somewhat by the fact that the government can use the Count Five Transfer to argue the same point, the Court must consider the "offering party's need for evidentiary richness and narrative integrity in presenting a case, and the mere fact that two pieces of evidence might go to the same point would not, of course, necessarily mean that only one of them might come in." *Old Chief v. United States*, 519 U.S. 172, 183 (1997). The question is whether the probative value of the evidence is "substantially outweighed" by one of the dangers identified in Rule 403. As Defendant has not identified any concern that outweighs, much less substantially outweighs, the probative value of the Additional Transfer, it is admitted.

*(B)     The Peer Comparison Data*

Defendant seeks to exclude evidence that Defendant's billings to Medicare were significantly higher than any other provider in the country for certain CPT codes (the "Peer Comparison Data"). The government intends to present this evidence in terms of both the number of procedures performed and the total dollar amount Medicare paid for those procedures. For

example, the government alleges that, during the relevant period, Medicare paid Defendant $981,000 for 2,143 procedures identified by the CPT code 27301. During that same period, the next highest biller in the country for CPT code 27301 performed 127 of these procedures for $29,000 in remuneration from Medicare. Defendant maintains that this evidence is not relevant, because the government cannot show that Defendant knew his billing was disproportionately high compared to other Medicare providers. The government counters that the Peer Comparison Data is relevant, both as evidence of Defendant's fraudulent intent, and as evidence that Defendant billed for procedures he did not perform.

The unexplained logic behind Defendant's argument appears to be that, if Defendant was aware that his billing was significantly greater than other providers, he would have been on notice that something was amiss with his billing practices. Defendant's knowledge of potential improprieties with his billing would tend to undermine the argument that he mistakenly over-billed Medicare. However, because the government has not shown that Defendant knew about his disproportionately high billing, the Peer Comparison Data has no bearing on whether Defendant knowingly and willfully submitted false claims to Medicare. Under this rationale, the Defendant is correct that the Peer Comparison Data is not relevant to Defendant's intent. However, this does not end the inquiry because this evidence is relevant and probative on other grounds.

The Peer Comparison Data is relevant to whether Defendant performed the surgeries for which he sought reimbursement. According to the government, the number of claims Defendant submitted for certain types of surgeries vastly exceeded the number of claims submitted by other physicians throughout the country for those same surgeries. The mutually exclusive inferences that can be drawn from this information are that Defendant was exceptionally hard working and efficient as compared to his peers, or, Defendant billed for phantom surgeries while his peers did

not. Defendant is free to argue the former, but the government will not be precluded from arguing the latter. *See United States v Alexander*, 748 F.2d 185, 188-89 (4th Cir. 1984) (no abuse of discretion where district court admitted peer group analyses which showed that defendant ranked first or second among other doctors in the area for certain gynecological tests; evidence supported "the 'non-performed tests' theory of guilt"); *see also United States v. Russo*, 480 F.2d 1228, 1243 (6th Cir. 1973) (comparison of defendants' claims with the claims of all 10,000 doctors in Michigan properly admitted to support the inference that "the defendants did not actually perform the extremely large numbers of certain designated medical procedures for which they were paid").

Defendant further argues that the Court should exclude the Peer Comparison Evidence as "highly prejudicial" pursuant to Rule 403. Def. Fir. Mot. at 6. His theory is that this evidence "will undoubtedly influence jurors into deciding . . . Defendant's guilt based on the amount of money he received from Medicare, rather than based on proof of the crimes charged." *Id.* He raises a related concern in his second motion *in limine*, where he moves to preclude the government from informing the jury that, during the relevant period, Defendant submitted $85 million in claims to Medicare and received $7.3 million in reimbursement from Medicare. Def. Sec. Mot. at 9. He asserts that, because the government cannot prove that all of these claims were fraudulent, these figures would potentially "shock the jury into finding guilt based on the amount[s] alone." *Id.* As these issues substantially overlap, the Court addresses them both here.

In its response to the Defendant's second motion, the government states that it will not rely on the $85 million figure at trial. However "[t]he government does intend to reference, at a minimum, the amount the defendant was paid for the [F]eatured [P]atients and the amount that the defendant was paid for procedures that he billed as having taken place in the operating room when he was in fact not there." Government's Opposition to Defendant's Second Motion *in Limine*

(Gov't. Op. Def. Sec. Mot.), Dkt Entry No. 129, at 4. The government also plans to "discuss[] the billed amounts for the patients referenced at trial." *Id.*

Based on the government's representations, the Court reserves decision on whether to allow the government to mention the $85 million figure and the $7.3 million figure. Should the government later wish to admit this evidence, leave is granted to make the application at an appropriate time. The other dollar amounts referenced in the government's opposition to Defendant's second motion are admitted. As a general matter, the government may introduce the amount billed and the amount paid for: (1) any claim alleged to be fraudulent, and (2) any of the Featured Patients.

Regarding the Peer Comparison Data, the Court admits this evidence because it circumstantially demonstrates that Defendant did not perform the *number* of surgeries he claimed to have performed. Thus, the probative value of the evidence lies in the comparison of the number of surgeries performed, not the dollar amounts reimbursed for these surgeries. Furthermore, for now, the government indicates that it will not rely on the total amount Medicare reimbursed Defendant during the relevant period ($7.3 million). Because the Court presumes that this amount represents the sum of the amounts reimbursed per CPT code, the government need not rely on the amount reimbursed per CPT code for purposes of the Peer Comparison Data. The Defendant has identified at least some unfair prejudice that may result from admission of the dollar amounts from the Peer Comparison Data. As the government has not identified the probative value of these dollar amounts, they are excluded from the government's presentation of this evidence. However, to be clear, the Peer Comparison Data is admitted with respect to the number of surgeries performed by Defendant and his peers per CPT code. Additionally, the government may request that the Court admit the dollar figures if it can explain their probative value.

*(C)* *Evidence of a Spike in Defendant's Claims*

Defendant moves to exclude evidence that his billings to Medicare radically increased, or "spiked," in approximately January 1, 2011 (the "Spike Evidence"). He asserts that the Spike Evidence is irrelevant because the claims submitted before January 1, 2011 pre-date the period in which the alleged scheme occurred. The government argues that this evidence shows Defendant's fraudulent intent, because the spike corresponded with the beginning of the alleged scheme. The government is correct.

The Spike Evidence is relevant to Defendant's intent for the same reason the Peer Comparison Evidence was not relevant to his intent: knowledge. Unlike the Peer Comparison Evidence, Defendant knew that his billing post-2011 vastly exceeded his billing prior to 2011. Defendant's knowledge of this spike suggests that he deliberately, as opposed to mistakenly, increased the number of claims he submitted to Medicare.

As for Defendant's Rule 403 argument, the same considerations that compelled exclusion of the dollar amounts from the Peer Comparison Data also compel their exclusion here. The point of the Spike Evidence is to demonstrate that the *number* of claims significantly increased beginning January 1, 2011. This can be accomplished without reference to the amount of money Medicare reimbursed Defendant before and after this date. Therefore, until the government can explain the probative value of the dollar figures, the prejudicial effect of this evidence militates toward their exclusion, and the government may only introduce evidence that the number of claims spiked.

**CONCLUSION**

For the foregoing reasons: (1) Defendant may not argue that he did not act knowingly or willfully because Medicare paid his claims without objection; (2) evidence that Defendant

defrauded private insurers is admitted; (3) the Additional Transfer is admitted, but the government must redact any mention of Pakistan as the location of the transferee bank; (4) claims submitted on behalf of the Medicaid Beneficiary are excluded; (5) the number of procedures from the Peer Comparison Data is admitted, but only for the purpose of demonstrating Defendant did not perform the procedures for which he billed; (6) the number of procedures from the Spike Evidence is admitted, for the purpose of proving Defendant's intent and as evidence that he did not perform the procedures for which he billed. The Court reserves decision on the $8.5 million and $7.3 million figures.

SO ORDERED.


Dated: Brooklyn, New York
     June 24, 2016

                                    _____/s/_____
                                           Dora L. Irizarry
                                            Chief Judge