UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,                     :
                                              :
         -against-                            :
                                              :        **OPINION AND ORDER**
SYED IMRAN AHMED,                             :         14-cr-277 (DLI)
                                              :
                        Defendant.            :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, Chief Judge:**

Before the Court is the parties' second set of motions *in limine*. The government moves, *in limine*, to: (1) preclude Defendant[1] from cross-examining physician witnesses regarding prior medical malpractice actions filed against them; (2) preclude Defendant from admitting certain out-of-court statements made by Defendant when interviewed by the United States Department of Health and Human Services ("HHS"); and (3) admit testimony from Defendant's former business partner regarding Defendant's knowledge of medical billing. Gov't. Sec. Mot.[2] Defendant opposes each request. Defendant's Opposition to the Government's Second Motion *in Limine* ("Def. Op. Gov't. Sec. Mot."), Dkt. Entry No. 127, at 1.

Defendant moves, *in limine*, to: (1) limit the scope of the Medicare beneficiaries and claims evidence the government may introduce at trial; (2) preclude the government from arguing that Medicare is "funded by taxpayers;" (3) preclude the government from eliciting testimony from

---

[1]    The Court incorporates into this Opinion and Order all party-name abbreviations and designations from the Amended Opinion and Order, dated July 1, 2016, addressing the first set of motions *in limine* (the "Amended First Motion Order"), Dkt. Entry No. 144.

[2]    The government also filed under seal (in contravention of this Court's individual rules regarding requests to seal documents) an additional motion *in limine* seeking to limit the scope of Defendant's cross-examination of a potential government witness. Government's Supplemental Motion *in Limine* to Second Motion *in Limine*, Dkt. Entry No. 123. Defendant has indicated that it does not intend to explore the matter the government seeks to exclude on cross-examination, but reserves the right to request additional information about this issue from the Government. Letter from J. Andres to Irizarry, C.J., dated June 17, 2016, Dkt. Entry No. 128. Although Defendant's letter appears to have resolved the Government's Supplemental Motion *in Limine*, the Court will address any follow-up issues at trial, outside the presence of the jury.

hospital administrators regarding Defendant's Medicare billing practices; (4) preclude witnesses from offering fact testimony regarding Medicare claims processing and Medicare regulations; (5) preclude witnesses from characterizing Defendant's actions as "fraud;" and (6) preclude expert testimony concerning the importance of "complete and accurate medical record keeping and billing." Def. Sec. Mot. The government consents to the fifth request, which is now moot, but opposes the remaining requests. Gov't Op. Def. Sec. Mot. at 1.

For the reasons set forth below, the government's motion is granted. Defendant's motion is granted to the extent that the government is precluded from arguing that "taxpayers" are victims of Defendant's fraud or referring to "taxpayers" when describing Medicare, and otherwise is denied. Accordingly, (1) the government may introduce evidence concerning any patients or Medicare claims that it has disclosed previously; (2) hospital administrators may read entries from billing records and claims data that will have been introduced into evidence already by other witnesses; (3) the government may introduce factual evidence from its National Government Services, Inc. ("NGS") witness; and (4) the government may introduce expert testimony concerning "complete and accurate medical record keeping and billing."

## DISCUSSION[3]

## I. The Government's Second Motion *in Limine*

### A. *Prior Medical Malpractice Actions Involving Physician Witnesses*

The government indicates that it expects to call multiple physicians at trial as fact witnesses, and at least one as an expert witness. Gov't. Sec. Mot. at 1. Two of the physicians, Gregory Zito, M.D. and Maryann Bilotti, D.P.M., are expected to testify about the treatment they

---

[3]     The relevant background, including discussion of the indictment, is set forth in the Amended First Motion Order.

provided to patients, and a third, Mohammed Islam, M.D., is expected to testify about his professional relationship with Defendant, which occurred between four and seven years prior to the beginning of the charged conduct. *Id.* at 1-2. The government also anticipates calling Frank Ross, M.D. to testify as an expert about wound practices and general surgery. *Id.* at 5.

All four physicians have been named as defendants in medical malpractice actions, but none of the lawsuits have resulted in any adverse findings against them. *Id.* at 2-3, 5. The government represents that the three fact witnesses, collectively, have been named in at least a dozen lawsuits, but that, after questioning the physicians and looking at public records, no adverse findings have been disclosed. *Id.* With respect to Dr. Ross, the government's expert witness, the government initially explained that he has been named in only two lawsuits, one of which settled approximately twenty years ago and was unrelated to wound care. *Id.* at 5. According to the government, another lawsuit was filed earlier this year against Dr. Ross and five other defendants and alleges that defendants failed to diagnose cancer of the plaintiff's foot, which led to its amputation. *Id.* No findings have been made as to the second lawsuit. *Id.* Only yesterday the government disclosed the existence of other lawsuits, which Dr. Ross recalls were "either dismissed by the court in their entirety without any finding of liability against Dr. Ross or that he was individually dismissed as a party to these suits without any finding of liability." Letter from R. Capers to M. Fodeman and C. Grealis, dated June 30, 2016, Dkt. Entry No. 140.

The government seeks to prevent Defendant from introducing evidence of these lawsuits on cross-examination. Defendant opposes, asserting that: (1) Dr. Ross's involvement in medical malpractice actions are an appropriate cross-examination topic because, as an expert, Dr. Ross's credentials and competency are at issue; and (2) the same should apply to the fact witnesses because: (a) Defendant "anticipates that these witnesses will offer testimony that is shaped by

their medical training and expertise," and (b) the evidence of the malpractice suits goes to the "credibility and competency" of the physicians. Def. Op. Gov't. Sec. Mot. at 1-4.

Pursuant to Rule 608(b) of the Federal Rules of Evidence, "specific instances of a witness's conduct" may be raised on cross-examination "to attack or support the witness's character for truthfulness," only "if they are probative of the character for truthfulness or untruthfulness of the witness." Even where an instance of conduct is considered probative initially, the Court must then weigh whether the probative value outweighs the danger of "unfair prejudice, confusing the issues, misleading the jury [or] wasting time." FED. R. EVID 403.

    1. Dr. Ross

The question of whether prior lawsuits generally may be introduced against expert witnesses on cross-examination appears to be an issue of first impression in this Circuit.[4] Other courts have split on this issue. *Upky v. Lindsey*, No. 13-cv-0553, 2015 WL 3862944, at *19 (D.N.M. June 3, 2015) (collecting cases) ("While courts are fairly unanimous that evidence of prior lawsuits should not be introduced against a defendant in a medical malpractice case . . . they are split over whether evidence of prior lawsuits may be introduced against an expert witness. A

---

[4]    Defendant's citation to *United States v. Nachamie* 28 F. App'x 13, 20 (2d Cir. 2001) (Summary Order) as support for the position that evidence of prior malpractice lawsuits are an appropriate topic for cross-examination of an expert witness is inapposite. *See* Def. Op. Gov't. Sec. Mot. at 2-3. In *Nachamie*, the court assessed the district court's ruling that defendant was not permitted to call an expert witness *back to the stand* to face cross-examination about a prior medical malpractice settlement, the existence of which evidently was inconsistent with the doctor's prior testimony. The case did not provide the opportunity for the court to opine on whether the introduction of the lawsuit would have been appropriate for a purpose other than to contradict the prior testimony of a witness after that witness' testimony had concluded.

    The government's citation to *Kaufman v. Columbia Mem'l Hosp.*, No. 11-cv-667, 2014 WL 3888229, at *4 (N.D.N.Y. Aug. 7, 2014); Gov't. Sec. Mot. at 6, also misses the point as that case addressed the admissibility of plaintiff's malpractice settlement history.

    The Court has conducted its own research and confirmed that no cases within the Circuit appear to apply to this specific situation.

number of courts hold that evidence of prior lawsuits is relevant to the expert's credibility, competency, expertise, and bias. . . . Other courts have held that evidence of lawsuits against an expert witness is irrelevant to the witness' testimony.") (internal citations omitted).

As set forth above, Rule 608(b) permits evidence of prior malfeasance by a witness under cross-examination only under very limited circumstances that are probative of truthfulness. The Court does not consider the existence of a complaint containing unproven allegations or a settlement agreement lacking any adverse findings probative of the witness' truthfulness. Defendant's argument that evidence of prior malpractice actions otherwise could be helpful to the jury in assessing the competency or expertise of Dr. Ross is unpersuasive. One of the lawsuits was settled twenty years ago and, as such, is too remote in time to have any significance. *See United States v. Schwab*, 886 F.2d 509, 514 n.3 (2d Cir. 1989) (explaining that Congress intended the matter of timeliness of prior misconduct to be left to "the discretion of the court"). The other lawsuits are not probative on cross-examination of Dr. Ross as there apparently have been no adverse findings against him.

The Court further finds that the two lawsuits in which Dr. Ross was named involved medical issues that are not related to Dr. Ross's anticipated testimony in this case on wound practices and general surgery. Because the lawsuits appear to lack the subject matter connection that could render them useful to a jury in assessing the expert's credentials and competency, the probative value of the lawsuits is substantially outweighed by the potential for unfair prejudice. *See* Fed. R. Evid 403. Therefore, the government's motion to exclude introduction of these lawsuits is granted.

2. <u>Dr. Bilotti, Dr. Zito and Dr. Islam</u>

For similar reasons, the Court finds Defendant's arguments concerning the admissibility of

malpractice lawsuits of the fact witnesses to be unavailing.  As noted above, the Court does not consider this evidence be of the type that bears on a witnesses' truthfulness or untruthfulness pursuant to Rule 608(b).  Moreover, unlike an expert witness whose competency, or lack thereof, regarding their field of expertise could be important to a jury, there is little utility in presenting or attacking the credentials of witnesses who merely are testifying about their recollection of certain events.

Defendant cites to 3500 material[5] (which was not provided for the Court's reference) as support for his assertion that he "anticipates that [the fact] witnesses will offer testimony that is shaped by their medical training and expertise."  Def. Op. Gov't. Sec. Mot. at 4.  However, based on the government's description of the testimony that it expects to elicit from these witnesses Gov't. Sec. Mot. at 1-2, the Court disagrees that their testimony will bear on any complex medical issues that could necessitate a closer look at the witnesses' credentials.  As a result, the Court finds the probative value of the lawsuits as substantially outweighed by the potential for unfair prejudice as to all three fact witnesses.  Therefore, the government's motion to exclude introduction of malpractice lawsuits is granted as to the fact witnesses.

### B.  Defendant's Statements to HHS

The government seeks to prevent Defendant from introducing certain statements he made about wound care procedures to Special Agents from HHS on September 3, 2013 ("September 2013 Interview").  Gov't. Sec. Mot. at 7.  The interview was divided into three topics:  (1) history of Defendant's employment; (2) discussion of Defendant's billing practices; and (3) discussion about Defendant's wound care procedures.  With respect to the third topic, Defendant's statements

---

[5]      "3500 material" is discovery material provided by the government to the defense pursuant to the Jencks Act, 18 U.S.C. § 3500.

included the following: (a) that wound care involved certain non-invasive procedures, including exposing a wound, draining the pus from the wound, cleaning the affected area, packing the wound and bandaging the wound; (b) at times he made an incision in the wound to properly drain it; (c) the incisions were done at bedside and were so slight that the patients may not have known they were cut; (d) he left wounds open to heal; and (e) he could treat several wounds in the manner set forth above within fifteen minutes. *Id.* at 7-8; *see* Ex. A to Def. Op. Gov't. Sec. Mot., Dkt. Entry No. 127-2 (HHS agent's handwritten notes).

The government asserts that Defendant's statements constitute inadmissible hearsay under Rule 802 and no exception applies. Defendant advances two theories for their admissibility: (1) the statements constitute an exception to the hearsay rule to show Mr. Ahmed's "then-existing state of mind (such as motive, intent or plan)," FED. R. EVID 803(3); or (2) if portions of the interview are introduced by the government, the "rule of completeness" may require the statements to be entered in their entirety, *see* FED. R. EVID 106. Def. Op. Gov't. Sec. Mot. at 5-9.

The Court finds that the statements are inadmissible hearsay under Rule 802. Should the government seek to introduce any of Defendant's statements as a recorded writing by one of the agents, Defendant may renew its request to introduce all of Defendant's statements at that time. *See* FED. R. EVID 106.

The government seeks to exclude only those statements regarding wound care procedures and intends to introduce other portions of the September 2013 Interview as a statement by a party opponent pursuant to Rule 801(d)(2)(A). Defendant may not introduce his statements about wound care procedure as those statements are inadmissible hearsay to which none of the exceptions that Defendant cites apply. "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible. When the

defendant offers his own statement simply to show that it was made, rather than to establish the truth of the matter asserted, the fact that the statement was made must be relevant to the issues in the lawsuit." *United States* v. *Marin*, 669 F.2d 73, 84 (2d Cir. 1982).

The Rule 803(3) state of mind exception does not apply as the Defendant's statements on wound care are not related to the elements of the offenses charged in the lawsuit, and are too remote in time to the events in question. *See Id.*; *United States v. Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991) ("To admit statements of one's state of mind with regard to conduct that occurred eight months earlier as in this case would significantly erode the intended breadth of this hearsay exception.") Moreover, the Court is not persuaded by Defendant's argument that the statements are admissible simply to show that the statement was made, *see* Def. Op. Gov't. Sec. Mot. at 9, as an apparently veiled attempt to introduce the statements for their truth.

However, should the government seek to introduce a portion of the handwritten notes themselves, at that time, the Court will consider whether the entirety of the notes ought to be introduced in the interest of fairness. *See* Fed. R. Evid. 106; *United States v. Laster*, 313 F. App'x 369, 372 (2d Cir. 2009) (Summary Order) ("[A]n omitted portion of a statement must be placed into evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.") (quoting *United States v. Jackson*, 180 F.3d 55, 74 (2d Cir. 1999)).

Accordingly, the government's request preclude the introduction of Defendant's statements to HHS agents concerning wound care procedures is granted, without prejudice to Defendant to make an application to introduce them during the trial as discussed above.

*C. Admission of Evidence of Concerning Defendant's Prior Billing Practices*

The government seeks to introduce evidence of Defendant's billing practices from 2004-

2007[6] through the testimony of Dr. Islam, Defendant's business partner during that time period. Gov't. Sec. Mot. at 8-9. According to the government, Dr. Islam is expected to testify that he and Defendant used the same billing service during their partnership, and that Dr. Islam helped Defendant determine the appropriate codes to use for performing wound debridement procedures. *Id.* at 9. Specifically, the government expects Dr. Islam to testify about two encounters with Defendant in which he discussed billing practices with him. *Id.* In the first encounter, Dr. Islam allegedly discussed the coding for a procedure that Dr. Islam understood involved "a decubitus ulcer in need of debridement," and that Defendant chose a billing code "for a complex procedure involving the use of a skin flap that was commonly performed only by plastic surgeons." *Id.* at 9-10. When Dr. Islam questioned Defendant as to whether the code used was the correct one, Defendant purportedly stated that Dr. Islam was "being timid." *Id.* at 10.

In the second encounter, Dr. Islam allegedly spoke with Defendant about billing the plastic surgery procedure after receiving the EOB that disclosed Defendant had received significantly more for the plastic surgery procedure than he would have received for the wound debridement. *Id.* The government further expects Dr. Islam to testify that "he was uncomfortable with the defendant's having billed the surgery code and that he (Dr. Islam) did not want anything to do with it." *Id.* Dr. Islam also allegedly warned Defendant that "his actions risked serious consequences, including potentially time in prison." *Id.* In addition, Defendant told Dr. Islam that Defendant "was going to start using his brother to do his medical billing." *Id.*

Evidence of uncharged criminal conduct is relevant and potentially admissible under two doctrines. First, evidence of uncharged criminal conduct is relevant if the uncharged conduct

---

[6] The health care insurance offenses charged are alleged to have occurred from January 1, 2011 through December 12, 2013.

"arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (citation omitted); *cf. United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").

Second, evidence of uncharged criminal conduct is relevant and admissible as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" under Rule 404(b) of the Federal Rules of Evidence. *See United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984) ("[A]s long as the evidence is not offered to prove propensity, it is admissible."). The Second Circuit, while adopting an inclusionary approach to Rule 404(b), has held that three requirements must be met before evidence may be admitted under this rule. "Evidence . . . offered under Fed. R. Evid. 404(b) may be admitted if the court: 1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity; 2) determines that the evidence is relevant under Fed. R. Evid. 401 & 402,[7] and is more probative than unfairly prejudicial under Fed. R. Evid. 403; and 3) provides an appropriate limiting

---

[7]     Rule 401 states that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401.

Rule 402 states that "[r]elevant evidence is admissible unless any of the following provides otherwise:
• the United States Constitution;
• a federal statute;
• these rules; or
• other rules prescribed by the Supreme Court.

Irrelevant evidence is not admissible." FED. R. EVID. 402.

instruction to the jury, if one is requested." *United States v. Mickens*, 926 F.2d 1323, 1328 (2d Cir. 1991) (internal citations and quotations omitted).

However, not all relevant evidence is admissible. Under Federal Rule of Evidence 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. Upon weighing the probative value and risk of prejudice of admitting these uncharged crimes, the court must preclude any uncharged conduct that is unduly prejudicial to the defendant. The court also must "be careful to consider the cumulative impact of the evidence on the jury and to avoid the potential prejudice that might flow from its admission." *See United States v. Wallach*, 935 F.2d 445, 472 (2d Cir. 1991).

The Court finds that the evidence the government seeks to admit is admissible either as "necessary to complete the story of the crime on trial," pursuant to *Carboni* and its predecessor cases, and/or to prove Defendant's motive, intent, preparation, plan, knowledge and/or absence of mistake or accident under Rule 404(b)(2).

While the government's brief does not disclose the exact date of the alleged conduct at issue, the incidents appear to have occurred when Dr. Islam and Defendant were business partners, which was between four and seven years prior to the conduct charged. As such, the events at issue are too remote to be considered "inextricably intertwined with the evidence regarding the charged offense." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). For example, in *Carboni*, on which the government correctly relies for the applicable standard, the court considered the fact that the evidence at issue concerned conduct that "occurred at about the same time" as the conduct charged to be a main factor in finding that the two acts were "intertwined." *Carboni*, 204 F.3d at

44; *accord United States v. Dolney*, 2005 WL 2129169, at *2 (E.D.N.Y. Sept. 1, 2005), *aff'd sub nom. United States v. Pirgousis*, 290 F. App'x 388 (2d Cir. 2008) (Summary Order) (a "lapse in time cuts against a finding that the earlier conduct is 'inextricably intertwined' [with the charged conduct] or 'necessary' to explain events that occurred two years later"). In contrast, the uncharged acts that Dr. Islam purportedly will testify about do not have a temporal connection with the charged crimes.

However, the evidence that the government seeks to admit is admissible as "necessary to complete the story of the crime on trial," *Carboni*, 204 F.3d at 44, because the expected testimony includes key facts that shed light on the possible origins of Defendant's alleged crime. Specifically, Dr. Islam's anticipated testimony on how Defendant first enlisted his brother to do his medical billing would provide the jury with important background information that may not be learned from any other witness. *See United States v. Robinson* 702 F.3d 22, 37 (2d Cir. 2012) (finding evidence of defendant's prior involvement in the prostitution business as "necessary to complete the story" in order to rebut defendant's argument that the victim was his "'girlfriend' and he had no control over her prostitution activities.").

The Court finds that the evidence the government seeks to admit regarding Defendant's prior billing practices also is admissible to prove Defendant's motive, intent, preparation, plan, knowledge and/or absence of mistake or accident. *See* FED. R. EVID. 404(b)(2); *United States v. Curley*, 639 F.3d 50, 59 (2d Cir.2011) (holding that defendant's prior uncharged acts demonstrated "a pattern of activity that continued up to the time of the charged conduct," and were therefore probative of the defendant's intent). This "other act" evidence is relevant in that it tends to show, *inter alia*, that Defendant: (1) had knowledge of proper and improper Medicare billing practices; (2) intended to apply the billing codes associated with complex procedures instead of the

appropriate codes for simple wound debridement procedures; (3) was not mistaken in his selection of improper codes; and (4) planned to use his brother to do his billing in order to accomplish his alleged fraud.[8]

The Second Circuit's decision in *United States v. Cadet* is particularly illuminating in assessing the similarity of the intent between the uncharged acts and the charged conduct. 664 F.3d 27 (2d Cir. 2011). In *Cadet*, the Circuit held that, "[w]hen 'other act' evidence is offered to show knowledge or intent in particular, as opposed to other non-propensity purposes such as proof of identity or corroboration of witnesses, such evidence must be 'sufficiently similar to the conduct at issue' to permit the jury to draw a reasonable inference of knowledge or intent from the other act." *Id.* at 32 (quoting *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987)). The evidence the government seeks to introduce through Dr. Islam satisfies this standard as it is of the same nature as the conduct alleged in the indictment and, therefore, it tends to demonstrate that Defendant knowingly or intentionally committed the fraudulent acts the government alleges.

Accordingly, the government's motion is granted in its entirety.

## II.     Defendant's Second Motion *in Limine*

### A.   *Limitations on Patient and Medicare Claims Evidence*

Defendant's first request in his second motion *in limine* is to limit the universe of patient-

---

[8]     "[A]s a general rule," such evidence of knowledge or intent that is placed squarely at issue at trial "should await the conclusion of the defendant's case. However, where it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief, 'rather than waiting until the conclusion of the defendant's case.'" *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (citations omitted). A defendant can take the issue of his intent or knowledge out of dispute, but, to do so, he "must make some statement to the court of sufficient clarity to indicate that the issue will not be disputed." *United States v. Colon*, 880 F.2d 650, 659 (2d Cir. 1989). Here, Defendant has put the issues of knowledge and intent squarely at issue, Def. Op. Gov't. Fir. Mot. at 3 ("Whether the Defendant **mistakenly** applied the CPT codes set forth in the Indictment due to the complex and confusing nature of these regulations, or did so **intentionally** as the Government alleges (and must prove at trial), will be a principle issue in this case.") (emphasis in original). Therefore, it is appropriate at this juncture for the Court to rule on the admissibility of other act evidence to prove intent and knowledge.

witnesses and Medicare claims evidence that the government may introduce at trial. Def. Sec. Mot. at 6-9. This request relates to Defendant's fourth request in his first motion *in limine* in which he asked the Court to "order the Government to immediately disclose the specific additional claims that it intends to put forth . . . at trial." Def. Fir. Mot. at 7. In response to Defendant's first motion, the government agreed to provide Defendant with the list of claims he requested, Gov't. Op. Fir. Def. Mot. at 9, which, at the time, appeared to satisfy Defendant's request. *See* Defendant's Reply in Further Support of the First Set of Motions *in Limine*, Dkt. Entry No. 102 at 1 n.1. However, Defendant reasserts his objection in his second motion, in which he contends that the government only recently disclosed that it had substantially widened the scope of potential evidence it may use at trial, and requests that the Court preclude the government from introducing certain evidence. Def. Sec. Mot. at 6.

For the reasons set forth below, both of Defendant's requests are denied.

1. Discovery Provided by the Government

By the time Defendant had filed his first set of motions *in limine*, the government already had provided to Defendant a substantial amount of information about, and identified, the specific beneficiaries and claims that the government planned to introduce at trial. The disclosures came in the form of three letters, which the Court will summarize in turn.

First, on September 14, 2015, the government provided an initial set of information that was organized by beneficiary name and identified: (1) the relevant date range when services were provided by Defendant; and (2) the production status of the medical records pertaining to each beneficiary. Letter from K. Currie to M. Fodeman and C. Grealis, dated Sept. 14, 2015 ("Sept. 14 Letter"), Dkt. Entry No. 69. The government noted that, for each date identified in the chart, "the government contends that claims submitted for the specific procedures identified in the indictment

are fraudulent either because the procedures were not in fact performed as billed or were not performed as part of an unplanned, return trip to the operating room (when billed as if they had been) or both." *Id.* The government also informed Defendant that:

> the government may make reference at trial to other claims for services performed for other beneficiaries besides the ones identified in the [chart] for the purpose of demonstrating that the volume of procedures for which claims were submitted on a particular day supports an inference that the procedures were not actually performed – particularly when the procedures for which claims were submitted purportedly took place on the same day at different locations in the greater New York area.

*Id.*

Second, on January 8, 2016, the government provided additional discovery materials along with an updated chart. Letter from R. Capers to M. Fodeman and C. Grealis, dated Jan. 8, 2016 ("Jan. 8 Letter"), Dkt. Entry No. 80. The chart included information about an additional beneficiary that had been excluded inadvertently from the prior chart and identified the documents in which information about the relevant claims for that beneficiary could be located. *Id.* While the charts have not been made available for the Court's review, Defendant has indicated that the charts produced with the two letters collectively identified 24 beneficiaries and over 2,800 claims. *See* Def. Fir. Mot. at 7.

Third, on January 22, 2016, in response to a telephone call between the parties following the January 8 Letter, the government provided additional information about the documents that already had been produced and the information it intended to introduce at trial. Letter from R. Capers to M. Fodeman and C. Grealis, dated Jan. 22, 2016 ("Jan. 22 Letter"), Dkt. Entry No. 85. The categories of anticipated trial evidence included the following:

> the testimony of some of [the 24] patients or relatives of these patients; the testimony of medical and administrative hospital personnel concerning the patients' hospital records, which fail to establish that procedures related to Medicare Billings were performed; and expert testimony on, among other things, the apparent lack of

need for the surgeries (based on the patients' hospital records), as well as the types of (absent) supporting documentation for the procedures that should have been in the hospitals' files had the procedures been performed.

*Id.*

In addition to the updated information on the Featured Patients and corresponding claims, the January 22 Letter also identified other information that the government intended to introduce in summary form (the "Summary Evidence"):  (1) the Peer Comparison Data, produced to Defendant on October 14, 2014; (2) operating room logs from hospitals where Defendant practiced that were produced to Defendant on June 17, 2014, and identified by Bates number in the January 22 Letter ("Operating Room Logs"); (3) data purporting to show that Defendant performed more procedures on certain days than was possible (also identified for Defendant on June 17, 2014) ("Impossible Days Analysis"); and (4) the Spike Evidence. Jan. 22 Letter.

### 2. Defendant's First Motion *in Limine*

The Operating Room Logs and Impossible Days Analysis was the focus of Defendant's first motion *in limine*.  Fir. Def. Mot. at 6-7.  Specifically, Defendant contended that the government had failed to identify the specific claims underlying the Operating Room Logs and Impossible Days Analysis that would be put forth at trial.  *Id.*  Defendant did not move at that time for any additional detail with respect to the Peer Comparison Data or the Spike Evidence.

 In response to Defendant's motion, the government agreed to provide the underlying claims information, which it sent to Defendant on April 22, 2016.  Letter from R. Capers to M. Fodeman and C. Grealis ("Apr. 22 Letter"), dated Apr. 22, 2016, Dkt. Entry No. 107.  In the April 22 Letter, the government specified:  (1) the days on which the government alleges that Defendant billed more surgical procedures than he realistically could have provided; and (2) other days about which it may present evidence as to the number of surgeries allegedly performed by Defendant.

*Id.*  The government also specified that all of the days identified were days on which Defendant had billed for one of the Featured Patients.  *Id.*

### 3.  Defendant's Second Motion *in Limine*

In Defendant's second motion *in limine*, he argues that the government only recently disclosed that the universe of possible evidence presented is over 400 patients, representing over 18,000 claims.  Def. Sec. Mot. at 6.  Defendant contends that this "attempt to expand its case on the eve of trial is unfair" and undermines his ability to prepare for his defense, in contravention of Second Circuit precedent.  *Id.*  Defendant asks the Court to limit the evidence or allow for a "significant adjournment of trial."[9]  Specifically, Defendant seeks a ruling that would preclude the government from introducing evidence or argument at trial that:  (1) any Medicare claim not relating to one of the previously identified patients is fraudulent; and (2) "Dr. Ahmed caused the submission of over $85 million in claims to Medicare and/or received over $7.3 million in reimbursements from Medicare."  *Id.* at 9.  The Court has already ruled on (2).  *See* Amended First Motion Order, at 17-19.

The government urges the Court to deny Defendant's motion, arguing that Defendant has known for many months that the government intended to use evidence beyond that relating to the 25[10] Featured Patients.  Gov't. Op. Def. Sec. Mot. at 1-9.

### 4.  Analysis

Based upon the record in this case of the discovery provided to Defendant by the government, and the government's specification of the claims it seeks to focus on at trial, the Court

---

[9]      During the June 15, 2016 court conference (which occurred after Defendant submitted his second motion *in limine*), the Court ordered a two-week adjournment of the trial at Defendant's request, due in large part to Defendant having been deprived of the ability to review the discovery, with and without his attorneys, by the Bureau of Prisons.

[10]      On April 22, 2016, the government's chart was amended to add an additional patient.  *See* Apr. 22 Letter.

finds that there is no basis in law or in fact to limit the evidence the government seeks to introduce at trial. It is clear from the discovery correspondence that Defendant has had access to the vast majority of documents for many months, indeed even years. The record also is clear that the government, at every turn, has responded to each of Defendant's requests to identify the universe of information that it expects to introduce at trial. This despite the fact that the government need not disclose how it intends to prove its case at trial. *See United States v. Taylor*, 17 F. Supp. 3d 162, 178-79 (E.D.N.Y. 2014) ("A bill of particulars may not be used by the defense as a fishing expedition or to force the government to reveal all its evidence before trial. In general, '[a]cquisition of evidentiary detail is not the function of the bill of particulars.'") (quoting *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010)). Defendant does not appear to have been prejudiced in any way.

Defendant significantly overstates the amount of information that has been introduced by the government "on the eve of trial." *See* Def. Sec. Mot. at 6. Although not explicitly stated in the government's opposition, the Court's understanding is that the "400 patients (representing over 18,000 claims)" that Defendant contends were identified by the government in early June, represent the total claims (adding up to $85 million) allegedly submitted by Defendant. *See* Transcript of Status Conference, June 15, 2016 ("June 15 Tr."), at 38-42. However, the government notified Defendant that it intends to introduce only: (1) the Featured Patients, who were disclosed over nine months ago; and (2) certain information underlying the Summary Evidence, which was identified in January and expanded upon in the April 22 Letter. The Court finds Defendant was given more than ample notice prior to trial.

Significantly, Defendant apparently received the bulk of the documents underlying both

the Featured Patients and Summary Evidence in 2014, and, since then, the government has made every effort to identify specific categories of information in response to requests from defense counsel. Those efforts included, *inter alia*, (1) identifying the Featured Patients and corresponding claims, a subset of which will be introduced at trial, *see* Sept. 14 Letter; Jan. 8 Letter; Apr. 22 Letter; (2) providing information underlying the Summary Information that initially was identified with specificity on January 22, *see* Jan. 22 Letter; Apr. 22 Letter; and (3) agreeing to refrain from admitting proposed summary exhibits where all of the underlying information had not yet been produced to Defendant, *see* June 15 Tr. at 37.

Despite having had two years to do so, Defendant has not moved formally for a bill of particulars,[11] apparently because each time he requested specifics concerning the government's proof, the government complied. Now, just weeks before trial, Defendant claims that this detail is insufficient and seeks to preclude the scope of evidence the government should be permitted to introduce at trial. Defendant's request is denied. As detailed below, the cases relied on by Defendant are inapposite and are of no avail to him.

In *United States* v. *Bortnovsky*, for example, the Second Circuit reversed a court's denial of a bill of particulars where the defendant was accused of submitting false insurance claims for burglary losses. 820 F.2d 572, 574 (2d Cir. 1987). The court found that the district court had erred because, *inter alia*, the "relevance of key events was shrouded in mystery" and defense counsel, who had only four days to prepare for trial, was "left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged." (*Id.* at 575.) *Bortnovsky* presents a far different situation from here, where defense counsel has had the

---

[11]     Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to "move for a bill of particulars before or within 10 days after arraignment or at a later time if the court permits."

relevant documents for several months, if not years, and the government has set forth, in great detail, the universe of beneficiaries and claims that will be the focus at trial.

In *U.S. v. Nachamie*, the district court granted a request for a bill of particulars made by defendants charged with conspiracy to defraud Medicare, similar to the claims in the instant case. 91 F. Supp. 2d 565 (S.D.N.Y. 2000); *see United States* v. *Nachamie*, 91 F. Supp. 2d 552, 554 (S.D.N.Y. 2000) (describing the counts in the indictment). The court held that "because the Government has declined to identify which of the documents provided to the defense pursuant to Rule 16(a)(1)(C) it intends to use in its case-in-chief at trial, it must, instead, respond to an appropriate bill of particulars." *Nachamie*, 91 F. Supp. 2d 565, at 572. Essential to that holding was the fact that the government had not yet identified for defendants certain important information, including "which of the claims were false and in what way they were false," and, for each claim, the "defendant, type of falsity, claim number and date." *Id.* at 571. Indeed, a crucial distinction between *Nachamie* and the present case is that, in *Nachamie*, the government had not provided defendants with enough information to permit them to assess which specific claims were alleged against each individual defendant. The opposite is true here. The government has provided the names of 25 specific patients and claims relating to their treatment, as well as other specific evidence Defendant requested. Notably, the 3500 material was provided to Defendant more than two weeks prior to trial. *See* 18 U.S.C. § 3500(b) (providing that the government need not produce 3500 material for any witness until such witness finishes direct examination).

Accordingly, Defendant's request to limit the patient and Medicare claims evidence the government may introduce at trial is denied.

### B. Argument that Taxpayers Fund Medicare

Defendant moves to preclude the government from introducing any argument "that

Medicare is funded by taxpayers and therefore taxpayers are victims of the alleged crime." Def. Sec. Mot. at 9-10. The government, in turn, acknowledges that "appealing to the pecuniary interests of the jury is impermissible," and offers to "limit its argument to Medicare and taxpayers as victims generally and would not argue that the jurors themselves were victims of the defendant's fraud." Gov't. Op. Def. Sec. Mot. at 7-8. The government also maintains that it will need to describe the Medicare program to the jury as part of its case and intends to elicit the following testimony: "[1] that Medicare is a federally funded health insurance program; [2] that it is funded through federal taxpayer dollars; [3] that the taxpayer dollars are deposited into the Medicare Trust Fund; [4] and that the payments to providers are made from the Medicare Trust Fund." *Id.* For the reasons set forth below, Defendant's motion is granted to preclude the government from eliciting evidence about or making reference to the funding of Medicare by taxpayers or taxpayers as victims.

As both parties acknowledge, arguments that appeal to juror's pecuniary interests are inappropriate. Def. Sec. Mot. at 10; Gov't. Op. Def. Sec. Mot. at 8; *see United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007) (noting that "[r]emarks invoking the individual pecuniary interests of jurors as taxpayers are universally viewed as improper," and collecting authority from multiple circuit courts explaining the same); *United States v. Lotsch*, 102 F.2d 35, 37 (2d Cir. 1939) (indicating that the prosecutor "stepped beyond proper limits" by stating that "since the United States guaranteed bank deposits, the money lent to these borrowers came out of the jurors' pockets"); *United States v. Pirro*, 9 F. App'x 45, 50 (2d Cir. 2001) (Summary Order) (noting that "it may be improper to make truly direct appeals to the jurors' personal stake in the crimes at issue," but holding that "the prosecutor's alleged gesture toward the jury box while making reference to the taxpaying public's interest in the case, if it did occur at all, was [not] sufficiently

inflammatory to warrant a new trial."). However, the government attempts to distinguish arguments that jurors themselves are victims of Defendant's fraud with arguments that taxpayers generally are the victims. The Court finds both are inadmissible.

The government's proposed argument is comparable to the type that courts have prohibited as "encourag[ing] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Palma*, 473 F.3d at 902 (citation and internal quotation marks omitted). Indeed, the government's proposed limitation does very little to diminish the considerable risk that one or more jurors will not see the distinction and be put in the position of considering his or her personal interest. *See Murray v. Town of Stratford*, No. 11-cv-629, 2014 WL 3700982, at *4 (D. Conn. July 25, 2014), *reconsideration denied*, No. 11-cv-629, 2015 WL 630957 (D. Conn. Feb. 12, 2015) ("Any argument to the jury that a verdict awarded would be paid by taxpayers, would place the jurors, as taxpayers themselves, even if they are not taxpayers of the Town of Stratford, in the position of considering their personal interest."); *United States v. Fahnbulleh*, 752 F.3d 470, 480 (D.C. Cir. 2014), *cert. denied sub nom. Bondo v. United States*, 135 S. Ct. 316 (2014), *and cert. denied*, 135 S. Ct. 1520 (2015) (ruling that the district court's instruction to "disregard the comments that were made about the taxpayers . . . This is a case of the United States versus the two defendants. It's not a case of the taxpayers against the defendants" cured any prejudice to defendants).

For the same reasons, the government is not permitted to use the term "taxpayers" in its description of the Medicare program, as such references are not necessary to provide the jury with a complete description of how Medicare operates. Therefore, the government may explain "[1] that Medicare is a federally funded health insurance program;" and "[4] that the payments to providers are made from the Medicare Trust Fund," but is precluded from arguing "[2] that

[Medicare] is funded through federal taxpayer dollars;" or "[3] that the taxpayer dollars are deposited into the Medicare Trust Fund."

### C. Testimony from Hospital Administrators

Defendant seeks to limit the scope of testimony the government may introduce through administrators at hospitals where Defendant performed surgeries. Def. Sec. Mot. at 11-14. Defendant has no objection to the witnesses' authentication of patient files maintained by the hospital or testimony concerning the hospitals' recordkeeping practices, but argues that the government should be precluded "from showing the hospital administrators any Medicare billing records or eliciting any testimony interpreting the records." *Id.* at 14. Defendant contends that such testimony falls outside of the witnesses' personal knowledge pursuant to Rule 602 or is evidence that would not be "helpful to clearly understanding the witness's testimony or to determining a fact in issue," pursuant to Rule 701. *Id.* at 11-14. The government opposes Defendant's limitation, arguing that the witnesses should be permitted to refer to Defendant's claims history when authenticating patients' files. (Gov't. Op. Def. Sec. Mot. at 8-9.)

The government states it intends to ask the hospital administrators about the contents of certain patient files. For example, a witness may be asked to confirm the presence or absence of a "consent for surgery" form within the file. Defendant does not appear to take issue with the government's approach in that regard. The government also wants the witnesses to "read items from the claims data (already in evidence) to place their testimony in context for the jury." *Id.* at 9. The government agrees "to not ask these fact witnesses to render any opinions about the propriety of the defendant's purported treatment of the patients or draw any conclusions about whether the patient files support the defendant's claims to Medicare." *Id.*

Defendant has no objection to the introduction of patient files through the hospital

administrators. Accordingly, those are admitted. The hospital administrators may testify about the contents of the patient files and any notations on the face of the documents contained therein. They also may read entries from billing records and claims data that will have been introduced into evidence already by other witnesses, as no expertise in either billing or claims submissions is required. Notably, the government has agreed not to elicit these witnesses' opinions concerning billing or claims records, nor will the Court permit such testimony to be elicited.

### D.  Interpretations of the Medicare Claims Processing Manual

The government previously provided notice that it intends to call an employee of NGS, the Medicare administrative contractor for New York during the time period in the indictment, to testify about "the process for paying Medicare claims and the policies that determine which claims Medicare will reimburse, and at what rates." Gov't. Op. Def. Sec. Mot. at 9. Defendant moves to preclude any testimony from this witness, or any others, on the meaning of terms in the Centers for Medicare & Medicare Services manual or other Medicare regulations. Def. Sec. Mot. at 14. Defendant argues that, if such interpretations are to be allowed, the government must provide an expert disclosure that is more robust than what has been provided to date. *Id.* at 16.

The government counters that the NGS employee is not testifying as an expert witness, but as a fact witness. The government maintains that the NGS witness may rely "in some measure, on the applicable Medicare billing rules for the relevant surgical procedures . . . to educate the jury on the processing and payment of claims to Medicare for these surgical procedures," and further argues the testimony is relevant and would assist the jury in determining "whether (a) claims submitted by the defendant are false and fraudulent and (b) if so, whether the defendant knowingly submitted or caused to be submitted false or fraudulent claims with the intent to defraud Medicare." (Gov't. Op. Def. Sec. Mot. at 10.) The government does not expect the witness to apply the

Medicare billing rules to Defendant's own conduct; as such, no improper legal opinions will be elicited. *Id.* at 11.

The Court agrees with the government that the NGS witness need not be qualified as an expert in order to testify on the topics the government has described. The witness's testimony is not "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," *see* FED. R. EVID. 701, but rather is fact testimony from an agent of the institution that was charged with processing the claims the government alleges were false. The testimony is relevant and would be helpful to the jury in determining facts at issue in this case. *See Id.*

Indeed, the Second Circuit has found that analogous testimony appropriately is characterized as fact testimony. In *United States v. Cuti*, the court considered a challenge to the testimony of two accountants (one in-house accountant from defendant's company, and one accountant from the company's outside auditing firm) concerning "how they had accounted for the proceeds from the fraudulent transactions; how they would have accounted for the transactions had they been aware of the full facts; and how the material information that was withheld from them led to misstatements in the company's financial statements." 720 F.3d 453, 456 (2d Cir. 2013). Similar to the NGS witness' anticipated testimony on relevant Medicare billing rules in the present case, the accountants' testimony in *Cuti* included an overview of the relevant accounting rules under generally accepted accounting principles, including a statement from the Financial Accounting Standards Board and a SEC Staff Accounting Bulletin. *Id.* at 456-57. The court held that the accountants' testimony, alternatively, was factual testimony or lay opinion under Rule 701. *Id.* at 459.

The evidence offered by the government is of the same nature as that offered in *Cuti.*

Therefore, Defendant's motion to preclude the testimony of the NGS employee is denied.[12]

### E. Evidence of the Importance of Accurate Medical Record Keeping and Billing

In a letter dated December 14, 2015, the government gave Defendant notice of the expert witnesses it intended to call at trial. Letter from R. Capers to M. Fodeman and C. Grealis, dated Dec. 14, 2015 ("Dec. 14 Letter"), Dkt. Entry No. 78. Defendant now seeks limit the scope of the testimony of one of those experts, Dr. Frank Ross. Specifically, of the eight topics the government listed in its letter, Defendant only seeks to preclude Dr. Ross from testifying regarding item 7: "the importance of complete and accurate medical record keeping and billing generally." Dec. 14 Letter. Defendant argues that the "testimony is improper because it does not rely on any specialized knowledge that will assist the jury in determining a fact in issue pursuant to Rule 702 and because the prejudicial effect of the expert testimony substantially outweighs its relevance in this case." Second Def. Mot. at 18 (citations omitted). The government concedes that neither of these concepts "requires specialized or technical knowledge to understand," but argues that the testimony will "assist the jury in assessing the significance of the lack of documentation for surgical procedures performed by the defendant." Gov't. Op. Def. Sec. Mot. at 13-14.

Given the complexity of the subject matter, the Court finds that background information on recordkeeping and billing could assist the jury in making its factual determinations. The probative value of understanding this background information outweighs what the Court perceives to be the small risk of undue prejudice. Accordingly, Defendant's motion to preclude this testimony is denied.

---

[12] The Court was not provided with the government's full expert disclosure, and as a result, could not assess Defendant's argument that it was deficient. However, because the Court accepts the NGS witness as a fact witness, there is no need for the Court to consider that aspect of Defendant's challenge.

## CONCLUSION

For the reasons set forth above, the government's motion is granted. Defendant's motion is granted to the extent that the government is precluded from arguing that "taxpayers" are victims of Defendant's fraud or referring to "taxpayers" when describing Medicare, and otherwise is denied. Accordingly, (1) the government may introduce evidence concerning any patients or Medicare claims that it has disclosed previously; (2) hospital administrators may read entries from billing records and claims data that will have been introduced into evidence already by other witnesses; (3) the government may introduce factual evidence from its NGS witness; and (4) the government may introduce expert testimony concerning "complete and accurate medical record keeping and billing."

SO ORDERED.


Dated: Brooklyn, New York
      July 1, 2016


                                                  _____/s/_____

                                                  DORA L. IRIZARRY
                                                  Chief Judge