UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,                            :
                                                     :
                        -against-                    :
                                                     :          **OPINION AND ORDER**
SYED IMRAN AHMED,                                    :              14-cr-277 (DLI)
                                                     :
                        Defendant.                   :
----------------------------------------------------------------x

**DORA L. IRIZARRY, Chief Judge:**

On July 28, 2016, Syed Imran Ahmed, M.D. ("Defendant") was convicted after a jury trial of one count of health care fraud (Count One), three counts of making false statements in connection with the delivery of or payment for health care benefits, items, or services (Counts Two, Three and Four), and two counts of money laundering (Counts Five and Six). Following Defendant's conviction, this Court held a one-day evidentiary hearing on the government's proposed order of forfeiture of specific assets pursuant to 18 U.S.C. §§ 982(a)(1), (7), and the parties subsequently briefed their respective positions on the appropriateness of forfeiture. (*See* Gov't. Mot. for Forfeiture of Property and Forfeiture Money J. ("Government's Motion" or "Gov't. Mot."), Dkt. Entry No. 203; Def. Opp. to Gov't. Mot. ("Def. Opp."), Dkt Entry No. 206; Reply in Further Supp. of Gov't. Mot. ("Gov't. Reply"), Dkt. Entry No. 208.)

By motion dated September 9, 2016, Defendant moved for a judgment of acquittal on the money laundering counts, Counts Five and Six, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or in the alternative, a new trial on those counts pursuant to Rule 33. (Def. Mot. for J. of Acquittal or New Trial ("Defendant's Motion" or "Def. Mot."), Dkt. Entry No. 204; *See* Reply in Further Supp. of Def. Mot., Dkt. Entry No. 209.) In a footnote, Defendant also renewed the Rule 29 applications he made at trial following the close of the government's and

Defendant's cases in chief as to Counts One through Four. (Def. Mot. at 12 n.2.) The government opposes Defendant's Motion. (Gov't. Opp. to Def. Mot. ("Gov't. Opp."), Dkt. Entry No. 207.)

For the reasons set forth below, Defendant's Motion is denied in its entirety and the Government's Motion is granted, in part. The Court finds the Defendant is liable for and must forfeit at least $3,090,044.10, which represents the entire amount sought by the government for the Class I and Class II Claims. The Court will determine the additional amount Defendant must forfeit, if any, at the time of sentencing. As set forth below, Discussion § II.C.2.c, pp. 38-43, *infra*, the parties' sentencing submissions shall address the concerns raised by the Court regarding the government's calculation of the Class III forfeiture amount. A sentencing scheduling order will issue separately.

## BACKGROUND[1]

Defendant is a skilled general surgeon who enjoyed admitting privileges at nine hospitals[2] in Brooklyn, New York and Long Island, New York. (*See* Trial Transcript ("Tr."), Dkt. Entry Nos. 190-98 at 1628.) The conduct at issue in this case relates to Defendant's practice of fraudulently billing Medicare for procedures purportedly performed at these hospitals that he did not actually perform.

### A.  Medicare

Medicare, a federal health care program for individuals aged 65 or older, reimburses doctors for the cost of providing medical services to program beneficiaries. To apply for

---

[1]    Familiarity with the facts and procedural history of this case is presumed. The following facts are derived from the indictment ("Indictment," Dkt. Entry No. 22), the parties' motion papers, and the trial transcript. They are provided for background purposes only.

[2]    Defendant told agents he had admitting privileges at the following hospitals:  Brooklyn Hospital Center, Brookdale Hospital, Wyckoff Heights Medical Center, New York Methodist Hospital, Kingsbrook Jewish Medical Center, South Nassau Communities Hospital, Nassau University Medical Center, Franklin Hospital and Mercy Medical Center. (*See* Tr. at 1628.)

reimbursement, doctors submit claims that include certain information about the beneficiary and the services rendered. Medicare operates as a "trust-based system" (Tr. at 113), meaning that Medicare does not verify that procedures were actually performed by, for example, cross-referencing claims with medical records, but rather it relies on the representations of the medical professionals that each claim submitted was performed as billed.

Each medical service provided by a doctor is identified by a billing code known as a Current Procedural Terminology ("CPT") code. (*See* Government Exhibits ("GX") 98, 101.) CPT codes are established by the American Medical Association and made available to the medical community in publications that list and define each code. (*See Id.*) At trial, the bulk of the evidence presented by the government focused on Defendant's billing with respect to 11 CPT codes related to wound debridement and incision-and-drainage abscesses (the "Indictment Procedures") that Defendant billed to 16 patients (the "Featured Patients") over the period covered by the Indictment.[3] (*See* GX 649; *See also* Indictment, Dkt. Entry No. 22, at ¶ 8.)

With respect to surgeries, Medicare reimburses doctors for the "global surgical package," which includes, not only each surgery itself, but any medical care incidental to the surgery, such as pre- and post-operative visits, pain management, and dressing changes that are needed within a prescribed time period of the surgery. Most incidental medical services are considered part of the global surgical package, if performed during a specified length of time called the "global period." (*See* GX 34 (listing the global period for the Indictment Procedures).) Rather than reimburse doctors for each of these medical services separately, Medicare makes one lump sum payment for the entire global surgical package. However, Medicare makes an exception to this single payment

---

[3]     The scheme alleged in the Indictment ran from January 1, 2011 through December 12, 2013 the ("Indictment Period"). (Indictment ¶ 12.)

policy for unplanned trips to the operating room that may be necessary due to, among other things,

complications from the initial surgery. Such surgeries are individually reimbursable, even if they

occur during the global period. In order to indicate that a given procedure was performed during

an unplanned trip to the operating room, doctors submit claims with a "modifier" code "78". The

AMA CPT books introduced at trial define Modifier 78 as follows:

> **Unplanned return to the operating/procedure room by the same physician or other qualified health care professional following initial procedure for a related procedure during the postoperative period:**
>
> It may be necessary to indicate that another procedure was performed during the postoperative period of the initial procedure (unplanned procedure following initial procedure). When this procedure is related to the first and requires the use of an operating/procedure room, it may be reported by adding modifier -78 to the related procedure (for repeat procedures, see modifier -76).

(GX 98 at 569; GX 101 at 79.)

Documentation that is available on the United States Department of Health and Human

Services' ("HHS") website explains Medicare billing concepts to the medical community,

including information regarding Modifier 78. One such resource that the government introduced

at trial, called a "Global Surgery Fact Sheet," explains the meaning of "operating room" for

purposes of this return trip procedure:

> Treatment for post-operative complications requiring a return trip to the Operating Room (OR). An OR, for this purpose, is defined as a place of service specifically equipped and staffed for the sole purpose of performing procedures. The term includes a cardiac catheterization suite, a laser suite, and an endoscopy suite. It does not include a patient's room, a minor treatment room, a recovery room, or an intensive care unit (unless the patient's condition was so critical there would be insufficient time for transportation to an OR.

(GX 32, at 3, Global Surgery Fact Sheet ("Global Surgery Fact Sheet,") *available at*

http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-

MLN/MLNProducts/downloads/GloballSurgery-ICN907166.pdf.) This fact sheet also sets forth

"[w]hat services are included in the global surgery payment," which includes "all additional

4

medical or surgical services required of the surgeon during the post-operative period of the surgery because of complications, which do not require additional trips to the operating room." (*Id.*)

At trial, the government elicited testimony to demonstrate how Modifier 78 works in practice, using CPT Code 21501 as an example. (Tr. at 156.) Code 21501, which is the code for "Incision and drainage, deep abscess or hematoma, soft tissues of neck or thorax," has a 90-day global period. (GX 34.) This means that, for a given procedure, any "intraoperative services that are considered to be usual and necessary" occurring the day before, the day of, or within 90 days after the procedure must be billed as a single claim using CPT code 21501. (GX 101 at 319-20 (describing the "global surgical package").) If, however, the patient requires a second procedure during the 90-day window, the doctor may submit a second claim for CPT code 21501 and append the Modifier 78 to signify that the second procedure was an "[u]nplanned return trip to the operating/procedure room" that is separate from the procedure corresponding to the first claim submitted. The doctor then would be entitled to receive payment for each of the two claims.

### B. Defendant's Scheme to Defraud Medicare

At trial, the government presented overwhelming evidence that Defendant defrauded Medicare by submitting claims for procedures that were not performed as billed or were not performed at all. To prove Defendant's fraudulent scheme, the government presented three main categories of evidence, which the Court will summarize in turn.

#### 1. The Featured Patients

The evidence presented by the government centered on the 16 Featured Patients, nine of whom either testified at trial themselves or, for some elderly or deceased patients, a family member or friend with knowledge of their hospital stays testified in their place. For the remaining seven patients, the government introduced the patients' medical records and presented the testimony of

Dr. Frank Ross, M.D., a general surgeon and an associate professor of surgery at the New York University Hospital School of Medicine, who was accepted by the Court as an expert in wound care and general surgery. (Tr. at 346, 359.)

The unrebutted evidence introduced at trial showed that Defendant billed over two thousand surgeries for the 16 Featured Patients during what, for many, were brief hospital stays. Credible testimony from the patients, or other individuals with knowledge, supported the government's contention that Defendant did not perform any of the Indictment Procedures he billed for these patients. For example, the first witness in the case, Vitina Varrone, testified about her seven-day stay at Franklin Hospital where she was diagnosed for colitis, a gastrointestinal issue. (Tr. at 75.) Ms. Varrone testified that, because she was certain she had no issues whatsoever with the skin on her spine, legs or feet, she was surprised to see her Medicare billing statement list a total of 22 Indictment Procedures on those areas of her body during her week-long hospital stay. (Tr. at 66-73; *See* GX. 77N.)

A series of other witnesses followed Ms. Varrone, all of whom testified similarly about hospital stays that did not involve any wound treatment whatsoever or involved treatment of a different nature than that billed by Defendant. One of these witnesses was Patsy Rollins, a licensed practical nurse who testified about the final days of Alfreda Brewster's life at Mercy Medical Center in January 2013. (Tr. at 1127-28.) Ms. Rollins, who was Ms. Brewster's daughter and was with her during her hospital stay, testified that the only surgery performed on her mother was conducted in order to insert a catheter into her vein so she could receive chemotherapy drugs. (Tr. at 1128, 1130-35.) Ms. Rollins testified that her mother had a small decubitus ulcer on her sacral area and general itchiness on her skin but that she never had surgery for any wound or skin issues.

(Tr. at 1135.)  Despite this, Defendant billed Medicare for 83 Indictment Procedures over the final two and a half weeks of Ms. Brewster's life.  (*See* GX 77D.)

In addition to the first-hand accounts of the patients and their caretakers, Dr. Ross further supported the government's case by explaining, patient by patient, his conclusion that the medical files did not support Defendant's billing with respect to the Indictment Procedures.  Besides noting that the patients' medical files lacked documentation to support the surgeries Defendant billed for, Dr. Ross also explained the impossibility of performing surgeries at the rate Defendant had billed.  In perhaps the most blatant example, Defendant billed Medicare for over 600 Indictment Procedures on an 88 year-old woman named Mary White over the final 10 months of her life.  (*See* GX 77P.)  Dr. Ross found no documentation to support any of these surgeries and testified that not only had he himself never conducted that much surgery on a single patient, but the number of surgeries billed to Medicare for Ms. White is nearly *double* the number of surgeries the average surgeon would perform *in total, on many different patients*, in a year.  (Tr. at 508-10.)

Setting aside the sheer volume of the surgeries Defendant billed for, Dr. Ross also testified that many of the surgeries billed to Medicare were *actually* impossible to have performed due to the circumstances of individual patients.  Of particular note, Dr. Ross told the jury about his review of the medical files of two patients who had died before the surgeries purportedly were performed.  One of these patients was Robert McGurk, for whom Defendant billed Medicare for over 400 surgeries over the final five months of his life.  Dr. Ross testified that Defendant billed for six surgeries on each of the final seven days he was alive, explaining that Mr. McGurk was dead at the time when the final six surgeries purportedly took place.  (Tr. at 490.)  Dr. Ross further opined that the surgeries on the days just prior to Mr. McGurk's death also could not possibly have been performed as Mr. McGurk's was dying and would not have benefited from any additional wound

treatment.  (Tr. at 490-92.)  Similarly, Dr. Ross told the jury that Defendant's Medicare billing for Ms. White included six surgeries that purportedly occurred over a week following the day she died.  (Tr. at 508-09.)

Dr. Ross also highlighted two patients for whom Defendant billed Medicare for surgeries purportedly performed to the patients' legs, but the patients had no legs.  (Tr. at 414; 534-37.)  On one of these patients, Bertha Desire, a patient who had lost her legs following bilateral above-the-knee amputations, Defendant billed for two surgeries, one on each leg, on 13 separate dates over the course of a two-month period.  (Tr. at 534-37; GX 77G.)  Overall, Defendant billed Medicare for over 170 surgeries on Ms. Desire over the course of a year.  (GX 77G.)

### 2.  Peer Comparison and Spike Data

In order to bolster the inference created by the testimony of the Featured Patients that it was not possible for a single physician to perform so many surgeries, the government also presented: (i) "peer comparison" data that showed how Defendant's billing compared with other physicians across the country for the same procedures; and (ii) "spike data" to show how Defendant's billing of the Indictment Procedures changed over time.[4]  The peer comparison data revealed that Defendant led the country in billing for the Indictment Procedures by shocking margins.  Specifically, the analysis showed that Defendant was the highest biller in the entire country for 9 of the 11 Indictment Procedures, and was ranked second and third in the country for the other two Indictment Procedures.  (GX 85A; *See* Tr. at 1043-1108.)

The charts introduced into evidence by the government demonstrated that Defendant not only led the nation in billing for these nine procedures, but, in several cases, he did so by

---

[4]     The government introduced the peer comparison data through Elisabeth Jantaitis, an employee of SafeGuard Services, a Medicare program integrity contractor.  (Tr. at 1043-44.)

astounding margins. (GX 88A.) For example, Dr. Ross testified that CPT code 22015—which is the code for drainage of "deep abscess (subfascial)" of the lower spine—was associated with a difficult procedure requiring an incision deep enough to reach the spinal column. (Tr. at 398-99.) Dr. Ross explained that the procedure was sufficiently complex such that he, as a general surgeon, would not even perform this surgery himself, but would require the presence of an orthopedic surgeon or neurosurgeon. (*Id.*) Nevertheless, the peer comparison chart showed that Defendant billed for 3,577 of these procedures over the two-year period covered by the Indictment. The next highest biller in the country submitted claims for only 49 procedures—73 times fewer than Defendant. (GX 88A.) Similarly, as to CPT code 27030, the code associated with a deep incision into the hip joint—another procedure Dr. Ross testified he would not attempt as a general surgeon (Tr. at 526-27)—Defendant billed for 1,033 surgeries (GX 88A); the next highest biller in the country billed for only 67—15 times fewer than Defendant (*Id.*). All told, Defendant submitted more than three times as many claims as the next highest biller in the country for 8 of the 11 Indictment Procedures. (*Id.*)

The spike data showed the changes in Defendant's billing practices between April 2007 and the end of 2013. (Tr. at 1067-69; GX 74B.) The chart revealed that both the total number of patients Defendant billed and the number of claims submitted remained relatively steady through the end of 2010. (GX 74B; *See* p. 42 n.19, *infra* (showing screenshot of GX 74B).) However, starting in 2011, the number of Indictment Procedure claims Defendant submitted spiked drastically, ultimately topping out at 1,339 Indictment Procedures billed in January 2013. (*Id.*; *See* Tr. at 1069.) In that month, Defendant billed an average of 45 surgeries per day. (Tr. at 1069.)

### 3.  Modifier 78 Analysis

At trial, the government also introduced evidence to show that Defendant's scheme to defraud Medicare included using Modifier 78 to ensure he would receive payment for claims that ordinarily would be subject to a global period.  In other words, the government alleged that, because all but one of the Indictment Procedures has a global period of either 90 days or 10 days (*See* GX 34), Defendant used Modifier 78 to bill the same patient multiple times during the global period for the initial surgery.

The government supported its theory with the testimony of Joseph Giambalvo, a Special Agent with the HHS Office of the Inspector General, Office of Investigations.  (Tr. at 1625.)  Agent Giambalvo, who was assigned by the Department to investigate Defendant's Medicare billing practices, explained to the jury the process through which he confirmed Defendant's fraudulent use of Modifier 78 in his billing of the Indictment Procedures.  (Tr. at 1777-87.)  Agent Giambalvo testified that he first assessed GX 77, which is a spreadsheet containing all of Defendant's Medicare claims from 2010 to 2013.  (Tr. at 1776.)  This spreadsheet corresponds to a 900+ page document (GX 86) that constitutes a compilation of every remittance report Defendant received from National Government Services, the government's Medicare billing contractor.  The remittance reports list every procedure for which Medicare paid Defendant (identified by patient name and CPT code) and the amount of each payment.  (*Id.*)  Each report is identified by a unique "Check/EFT"[5] number.  (GX 86.)

Agent Giambalvo testified that his analysis of the Modifier 78 claims (the "Modifier 78 Analysis") began by selecting a sample of these remittance reports for a closer review.  (Tr. at 1778-79.)  Specifically, Agent Giambalvo assessed every remittance statement dated between July

---

[5]    EFT stands for "electronic funds transfer."  (Tr. 1777.)

15, 2013 and August 21, 2013, which consisted of 29 separate remittance statements covering 6,935 claims.[6]  (Tr. at 1778-87; GX 655A.)  The agent then filtered these remittance statements for only the Indictment Procedures, leaving 6,597 claims, and filtered further for only those entries where Dr. Ahmed used Modifier 78, leaving a total of 6,188.  (Tr. at 1778-87; GX 655A.)  For each claim, Agent Giambalvo consulted the operating room logs from the hospital at which Defendant purportedly performed each procedure to see if Defendant, in fact, was present in the operating room for the procedure billed.  (Tr. at 1778-87; GX 655A.)  Based on his review, Agent Giambalvo concluded that operating room logs existed for only 67 (1%) of the 6,188 procedures. (GX 655A.)

To further support Agent Giambalvo's conclusion that Modifier 78 was used by Defendant to receive payment for surgeries that actually were not performed, the government presented evidence about Defendant's billing practices to show his direct involvement in the fraudulent use of the modifier.  For example, the government introduced documents titled "Patient Registration Records," known as "face sheets," on which Defendant handwrote billing codes and dates for the procedures that were to be billed.  (*See* Tr. at 850-51.)  At trial, the government presented the testimony of Syed Rehan Ahmed ("Rehan Ahmed"), Defendant's brother, who was in charge of Defendant's Medicare billing during the Indictment Period.  (Tr. at 850-55.)  Rehan Ahmed explained how Defendant used the face sheets, testifying that Defendant would mail Rehan Ahmed several face sheets at a time and that each document would contain, in Defendant's handwriting,

---

[6]     Twenty three of these remittance statements were all paid with a single check on July 15, 2013.  (Tr. at 1782.) Agent Giambalvo explained this was due to an administrative delay on Defendant's payments as a result of a credentialing issue.  (*Id.*)  Once this issue was resolved, Defendant was paid all at once for the delayed payments corresponding to the twenty three statements.  (*Id.*)

the CPT codes that were to be billed to Medicare.  (Tr. at 855-58.)  Rehan Ahmed confirmed that neither he nor his staff would ever change these notations on their own.  (Tr. at 857-58.)

Over the course of the trial, the government introduced into evidence several of these face sheets showing Defendant's request to bill Medicare for different Indictment Procedures, using Modifier 78, on multiple consecutive days.  (*See, e.g.* GX 304.6; GX 399.22; *See also*, Tr. at 850-66.)  In addition, Rehan Ahmed testified that, when Medicare rejected and sent back claims that Defendant had submitted without Modifier 78, Defendant instructed him to resubmit the claim with the modifier in order to avoid the global period rules.  For example, on one explanation of benefits form shown to Rehan Ahmed, he confirmed that Defendant had circled certain CPT codes and included a handwritten note requesting that Rehan Ahmed and his team "resubmit with modifier 78." (Tr. at 881-83.)  This resolved the issue and the claim was paid.  (*Id.*)

### C.  Money Laundering

To support the two money laundering counts, the government presented evidence of Defendant's financial transactions made after he received notice of the government's investigation in September 2013.  The government introduced this evidence through Agent Giambalvo and Joseph Cincotta, a Contractor/Forfeiture Investigator with the Federal Bureau of Investigation ("FBI").  Prior to working in his current role, Mr. Cincotta had been a special agent with the FBI for 34 years.  (Tr. at 2005.)

Agent Giambalvo provided a timeline of his investigation, including the timing of the financial transactions that the government used as the basis for the money laundering counts.  Agent Giambalvo explained that the government first interviewed Defendant on September 3, 2013, during the initial stages of its investigation.  (Tr. at 1627.)

12

The government called Mr. Cincotta later in the trial to testify about his analysis of Defendant's financial transactions.  Through Mr. Cincotta's testimony, the government initially demonstrated that the remittance reports that made up GX 86 corresponded to deposits made into Defendant's bank account.  (Tr. at 2004-13; GX 43.)  Mr. Cincotta then set forth the transactions Defendant made during the week after his September 3 interview with Agent Giambalvo.  In sum, the bank records reviewed by Mr. Cincotta revealed that Defendant made multiple $1 million transfers out of a TD Bank account, held in the name of Syed Imran Ahmed (the "TD Bank 5668 Account"), in which all funds received from Medicare had been direct-deposited.  (Tr. at 2013-25.)  The first $1 million transfer, which relates to Count Six of the Indictment, was drawn on the TD Bank 5668 Account on September 7, 2013, when Defendant wrote a check to himself and deposited it into a JP Morgan Chase account, held in the name of Syed Imran Ahmed (the "JPMC 8506 Account"), which Defendant had opened earlier that same day.  (Tr. at 2013-15.)  The second $1 million transfer, which relates to Count Five of the Indictment, was made on September 9, 2013, via an international wire transfer from the TD Bank 5668 Account to a Dubai Islamic Bank account that Defendant held in Pakistan.  (Tr. at 2015-19.)[7]

In addition to the two $1 million transfers that were the subject of Counts Five and Six of the Indictment, the government also introduced evidence of a third $1 million transfer that was not charged in the Indictment.  (Tr. at 2019-21.)  This transfer also was made on September 9, 2013, via an international wire transfer from the TD Bank 5668 Account to the Dubai Islamic Bank account that Defendant held in Pakistan.  (*Id.*)

---

[7]    Defendant is a United States citizen who emigrated from Pakistan and maintains family ties there.  (*See* Tr. at 262; 893-94; 2323.)

Mr. Cincotta testified that he also reviewed, and made a chart of, Defendant's history of international wire transfers (GX 75).  The chart showed that, of the 18 international wire transfers Defendant made from January 25, 2011 through September 8, 2013, all were for small amounts no greater than $35,780.85, and the vast majority were for $10,000 or less.  (Tr. at 2022-25; GX 75.)  The small amounts of these transactions stands in stark contrast to the two $1 million international transfers Defendant made on September 9, 2013.  (*See* GX 75.)

### D.  The Jury Verdict and Forfeiture Hearing

On July 28, 2016, the jury returned a unanimous verdict of guilty on all six counts.  (Dkt. Entry No. 180.)  Following the jury's verdict, Defendant indicated he was willing to waive his right to have a jury decide the issue of criminal forfeiture and, instead, requested that the Court decide the forfeiture amount at sentencing.  (Tr. at 2487-88.)  On August 1, 2016, the Court held a hearing on the forfeiture issue during which the government presented testimony from Mr. Cincotta and Agent Giambalvo.  (*See* Forfeiture Hearing Transcript ("Forfeiture Tr."), Dkt. Entry No. 199.)  The sum and substance of this testimony is set forth in the Government's Motion.  (*See* Gov't. Mot.)

During the forfeiture hearing and in its briefing, the government argued that the Court should order Defendant to forfeit $7,570,442.19, which is the total amount calculated for the three classes of Medicare claims that Defendant fraudulently submitted.  "Class I" claims are those representing Indictment Procedures billed, but not performed on, the 16 Featured Patients.  (Gov't. Mot. at 16-22, 24.)  The government argues that every one of these claims is fraudulent because either: (i) Defendant did not conduct any procedures whatsoever on these patients, or (ii) even if Defendant did conduct some procedures related to wound treatment, those billed were "upcharged"

14

such that Defendant received more money than that to which he was entitled. (*Id.*) The government seeks $898,923.40 for the Class I Claims. (*Id.* at 24.)

The "Class II" claims are those contained on the remittance statements reviewed by Agent Giambalvo as part of the Modifier 78 Analysis discussed at Background § B.3., pp. 10-12, *supra*, which were deemed fraudulent because no operating room log existed for them. (Gov't. Mot. at 24-25.) As noted above, Agent Giambalvo found that 99% of the claims on the remittance statements he reviewed were fraudulent. (*Id.* at 22-23.) To calculate the Class II total, the government added the value of these claims and subtracted all claims already included in the Class I total. (*Id.* at 24-25.) The government seeks $2,191,120.70 for the Class II Claims. (*Id.* at 25.)

The "Class III" claims are an extrapolation of the Modifier 78 Analysis to claims on other remittance statements that Agent Giambalvo did not review. (Gov't. Mot. at 25-26.) To arrive at the Class III total, the government added up the claims from all other remittance statements not reviewed as a part of the Modifier 78 Analysis. (*Id.*at 25.) The government then filtered these remittance statements for only the Indictment Procedures, and filtered further for only those entries where Defendant used Modifier 78, just as Agent Giambalvo had done in his analysis. (*Id.*at 25-26.) The government then subtracted 1% of the total, which represents an estimate of the Modifier 78 claims for which an operating room log may exist. (*Id.*) The resulting amount, and that which the government seeks for the Class III Claims, is $4,480,398.09. (*Id.* at 26.) While the government decided not to expend the resources to determine the exact number of legitimate procedures for which an operating room log exists, the government argues that the prevailing case law permits the Court to "make reasonable extrapolations from evidence established by a preponderance of the evidence at the sentencing proceeding." (*Id.* at 8 (quoting *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011).)

At the forfeiture hearing, the government also presented evidence that funds seized from the following bank accounts are traceable to Defendant's fraudulent scheme (the "Forfeitable Assets"):

     a. $142,299.73 seized from the TD Bank 5668 Account;

     b. $288,520.00 seized from TD Bank account no. xxxxxx9981, held in the name of Syed Imran Ahmed Foundation;

     c. $20,889.12 seized from the JPMC 8506 Account;

     d. $529,996.08 seized from Signature Bank account no. xxxxxx0558, held in the name of Fawad, Ghias and Imran, LLC (the "Signature Account");

     e. $5,715.18 seized from JP Morgan Chase account no. xxxxx0366, held in the name of Urban Comprehensive Medical Care, P.C.; and

     f. $482,217.00 seized from Pershing LLC retirement fund account no. xxx-052751, held in the name of Syed Imran Ahmed and another individual.[8]

(Gov't. Mot. at 2.)  With respect to items c and d, the government also contends that these accounts separately are subject to forfeiture due to their connection to the money laundering transaction charged in Count Six.  (*Id.*)  The government requests that the Court order the total, $1,469,637.11, be credited towards the money judgment.  (*Id.* at 2-3.)

### E.  Defendant's Rule 29 and 33 Motion

On September 9, 2016, Defendant moved pursuant to Federal Rules of Criminal Procedure 29 and 33 for a judgment of acquittal on Counts Five and Six or, in the alternative, a new trial on those counts.  (*See* Def. Mot.)  Defendant argues that the government has not proven a violation of 18 U.S.C. § 1957[9] because it failed at trial to establish that each transfer necessarily included at

---

[8]     By letter dated December 12, 2016, Defendant informed the Court that he did "not intend to take the position that forfeiture of Dr. Ahmed's retirement account is barred by ERISA."  (Dkt. Entry No. 210.)

[9]     18 U.S.C. § 1957 punishes whoever "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

least $10,000 of criminally derived proceeds. (*Id.* at 1.) At the time of the post-trial briefing, Defendant acknowledged a split in authority, both among the circuits, and within the Second Circuit, as to whether so called "strict tracing" is required by § 1957. However, Defendant argued that a "careful analysis" of the text of the statute as compared with a companion statute, 18 U.S.C. § 1956(a)(1), [10] demonstrates that a better interpretation requires the government to prove that each of the transactions underlying Counts Five and Six consisted of at least $10,000 of money that can be traced to Defendant's fraud. (*Id.* at 3-12.)

At the time of the post-trial briefing, a split as to the proper interpretation of § 1957 existed within the Second Circuit between *United States v. Weisberg*, 2011 WL 4345100 (E.D.N.Y. Sept. 15, 2011) and *United States v. Silver*, 184 F. Supp.3d 33 (S.D.N.Y. 2016) ("*Silver 2016*"). In *Weisberg*, the court assessed: (i) the case law in other circuits regarding the distinction between 18 U.S.C. §§ 1956(a)(1) and 1957, *Id.* at *3-4; and (ii) the Second Circuit case law on the burden of proof rules and accounting procedures in other criminal forfeiture contexts, *Id.* at *4-6 (discussing *United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986)). The court concluded that the strict tracing "approach taken by the Ninth and Fifth Circuits is more consistent with the allocation of the burden of proof in criminal cases [pursuant to *Banco Cafetero*] than that taken by the Third and Fourth Circuits. That is, unlike in the forfeiture context, the Government may not rely on a presumption that a withdrawal from a commingled account is a transaction 'in' dirty

---

[10]     18 U.S.C. § 1956(a)(1) punishes whoever, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, [i] conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity," and; (ii) satisfies one of the two specific mens rea elements set forth in 18 U.S.C. §§ 1956(a)(1)(A), (B). The main distinction between the § 1956(a)(1) and § 1957 is that the transaction at issue in § 1956(a)(1) need only "involve" proceeds of unlawful activity, which courts uniformly have interpreted to mean that the government need not trace the funds used in the transaction to the unlawful conduct. *United States v. Weisberg*, 2011 WL 4345100, *2 (E.D.N.Y. Sept. 15, 2011) (collecting authority). This contrasts with § 1957's requirement that at least $10,000 of the transaction must be "*in* criminally derived property." 18 U.S.C. § 1957(a) (emphasis added).

money." *Id.* at *5. In *Silver 2016*, the court concluded that the "majority" view among the circuits—embraced by the Third and Fourth Circuits, and others—was "far more convincing" because, "once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the 'dirty' and 'clean' funds cannot be distinguished from each other," and, therefore, adding a strict tracing requirement would make it easier for criminals to escape prosecution simply by commingling the funds. *Silver 2016*, 184 F. Supp. 3d at 51-52.

Defendant asserted that, if the Court were to agree that the "strict tracing" is required, the government has failed to present sufficient evidence that the two transactions at issue included at least $10,000 in criminal proceeds because the government necessarily must rely on the Modifier 78 Analysis, which Defendant claims is flawed. (*See* Def. Mot. at 9-12.) When Defendant first raised this issue in his Rule 29 motion at the close of the government's case, this Court denied the motion, noting that it was inclined to agree with the reasoning in *Silver 2016* and the other cases that have not required strict tracing. Quoting *Silver 2016*, the Court observed that "a requirement that the government trace each dollar of the transaction to the criminal as opposed to the noncriminal activity would allow individuals effectively to defeat prosecution for money laundering by simply commingling legitimate funds with criminal proceeds." (Tr. at 2046 (quoting *Silver 2016*, 184 F. Supp. 3d at 51 (quoting *United States v. Moore*, 28 F.3d 969, 975 (4th Cir. 1994))).) The Court found that the government had "met its threshold showing of transactions of over $10,000 stemming from the alleged illegal activity." (Tr. at 2047.)

In its opposition to Defendant's Motion, the government highlighted this Court's prior ruling, but also argued that it has met the requirements of § 1957 under any interpretation of the statute because the Modifier 78 Analysis revealed that each of the two $1 million transfers necessarily included at least $10,000 of dirty money. (Gov't Opp. at 14-16.) This analysis, which

18

is set forth in more detail on pages 14 through 16 of the Government's Opposition, revealed that, at the time of the two $1 million transfers that are the basis for Counts Five and Six, there was only $849,167 in purportedly clean funds with which Defendant could perform the two transactions. (*Id.* at 15-16.)   Therefore, because there was not enough clean money to clear even one the transactions, both $1 million transfers must have included at least $10,000 in dirty money.  (*Id.*) During oral argument on Defendant's Motion, Defendant's counsel did not dispute the government's math on this point, but instead argued that it was improper to use the Modifier 78 Analysis in calculating the total amount of Defendant's fraud.  (Nov. 18, 2016 Tr. at 8, 11.)

Earlier this month, while the motions at issue in this opinion were pending, the Second Circuit resolved the split within the circuit as to the proper interpretation of § 1957 by adopting "the majority view . . . that the Government is not required to trace criminal funds that are comingled with legitimate funds to prove a violation of Section 1957."  *United States v. Silver*, 2017 WL 2978386, at *10 (2d Cir. July 13, 2017) ("*Silver 2017*").  The court reasoned:

> Because money is fungible, once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the "dirty" and "clean" funds cannot be distinguished from each other.  As such, "[a] requirement that the government trace each dollar of the transaction to the criminal, as opposed to the non-criminal activity, would allow individuals effectively to defeat prosecution for money laundering by simply commingling legitimate funds with criminal proceeds."

*Id.* (quoting *States v. Moore*, 27 F.3d 969, 976 (4th Cir. 1994)).  This holding, and analysis, is consistent with the ruling issued by this Court following the close of the government's case.  (Tr. at 2046.)

# DISCUSSION

## I.    Defendant's Motion

### A.  Legal Standards

#### 1.  Rule 29

Federal Rule of Criminal Procedure Rule 29 permits a defendant to move for a judgment of acquittal following a guilty verdict.  FED. R. CRIM. P. 29.  The rule "imposes a heavy burden on the defendant, whose conviction must be affirmed 'if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in *Jackson*)).  For a defendant to succeed on a post-trial motion for a judgment of acquittal, the Court must find that "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks and citation omitted).  A court's conclusion that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt" must be based on its consideration of "all of the evidence, direct and circumstantial."  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (citation omitted).

On a post-verdict motion for a judgment of acquittal, a trial court may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *Cote*, 544 F.3d at 99 (internal punctuation omitted).  Instead, "[t]he court must give full play to the right of the jury to determine credibility, and must draw all possible inferences in favor of the government."  *Id.*; *See also United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence.") (quoting *Eppolito*, 543 F.3d at 45).  In other words, the court must "[v]iew[]

the evidence in the light most favorable to the government," which means "crediting every inference that the jury may have drawn in favor of the government, and recognizing that the government's evidence need not exclude every other possible hypothesis." *Eppolito*, 543 F.3d at 45 (internal quotation marks and citations omitted). However, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks and citations omitted).

### 2. Rule 33

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal citation omitted); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (cautioning that district courts should grant Rule 33 motions only "in the most extraordinary circumstances"). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). Put another way, to warrant a new trial, "there must be a real concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414.

### B. Application[11]

As Defendant acknowledged in a recent letter, the Second Circuit's ruling in *Silver 2017* effectively renders moot Defendant's arguments as to Counts Five and Six. (Dkt. Entry No. 212;

---

[11] Below the Court assesses the arguments in support of Defendant's motion to set aside the jury's verdict as to Counts Five and Six. In a footnote on the last page of Defendant's Motion, Defendant also "renews the arguments

*See* Nov. 18, 2016 Tr.)  Nevertheless, a key common issue presented in both Defendant's Motion and the Government's Motion is the suitability of using the Modifier 78 Analysis in calculating fraud proceeds.  With respect to Defendant's Motion, Defendant had acknowledged that he could prevail *only if* the Court were to *both*: (i) reject the Modifier 78 Analysis; *and* (ii) find that "strict tracing" is required under § 1957.  (*See* Nov. 18, 2016 Tr. at 8 ("MR FODEMAN:  . . .  We agree with what [the government] just laid out with one exception, and the issue is the propriety of assuming that 2.375 million of money that came into the account in the two months prior to these transactions at issue is properly considered fraud.  That's really the only issue here."); *Id.* at 8-9 (THE COURT:  In other words, if I were to adopt the analysis of Judge Caproni from Southern District in the Silver case, then --  MR. FODEMAN:  What we are about to talk about is irrelevant.) Although Defendant's motion must be denied in light of the Second Circuit's holding in *Silver 2017* that strict tracing is not required to prove a violation of 18 U.S.C. § 1957, for the avoidance of doubt, and because the Modifier 78 Analysis is also at the heart of the Government's Motion, the Court proceeds to address Defendant's arguments regarding the Modifier 78 Analysis.  As the Court finds the Modifier 78 Analysis evidence presented to be sound, the Court denies Defendant's motion on that basis as well.

Defendant's main objection to the Modifier 78 Analysis is that it is premised on the assumption that no legitimate procedure using the Modifier 78 can be billed unless it done in such a way that an operating room log would be generated.  (Def. Mot. at 11.)  Defendant contends that this premise is flawed because the definition of Modifier 78 expressly includes a "procedure" room

---

made in previous motions under Rule 29, which the Court ruled on after the close of the government's and Defendant's cases in chief."  (Def. Mot. at 12 n.2 (citing Tr. at 2067-80, 2212-13).)  For the reasons stated on the record during trial—namely, the overwhelming evidence presented as to Defendant's fraudulent scheme—Defendant's motion is denied as to Counts One through Four.

as distinct from an "operating" room. (Def. Mot. at 11; *See* GX 98 at 569; GX 101 at 79; p. 4, *supra*.) Defendant maintains, therefore, that it was inappropriate for the government to rely solely on operating room logs without looking to the patient's actual medical files to determine whether any documentation supporting a procedure conducted in a "procedure room" existed. (Def. Mot. at 11.) In its opposition to the Government's Motion, Defendant additionally argues that evidence presented at trial demonstrates that: (i) there is a distinction between an operating room and a procedure room; and (ii) wound debridement procedures can be performed outside of an operating room, including at a patient's bedside. (Def. Opp. at 12-13.)

Defendant's argument distracts from the clear evidence from which the jury could conclude that at least $10,000 of fraud proceeds were contained in each of the $1 million transfers. That evidence starts with the Medicare documentation that specifies the circumstances under which Modifier 78 may be used. As set forth above, this documentation establishes that the modifier is *not* to be used for procedures conducted in "a patient's room, a minor treatment room, a recovery room, or an intensive care unit (unless the patient's condition was so critical there would be insufficient time for transportation to an OR)." (GX 32 at 3.) The only areas outside of an operating room that are encompassed by the Modifier 78 definition are "a cardiac catheterization suite, a laser suite, and an endoscopy suite." (*Id.*)

The government's methodology in conducting the Modifier 78 Analysis is sound under this definition. As an initial matter, unrebutted evidence presented at trial demonstrated that Defendant was a wound surgeon that did not practice in any of the aforementioned specialized suites (*See* Tr. at 1884-85), and therefore, the government need not have assessed any documentation that may have been generated for procedures occurring in those locations. Moreover, even while it may be the case that an operating room log would not be generated in

those extraordinary circumstances when a procedure must be conducted outside of the operating room due to the critical condition of the patient, the HHS documentation defines such procedures as an exception.  (*See* GX 32 at 3.)  Therefore, it strains credulity to suggest that any significant percentage of the 6,121 Indictment Procedures for which Defendant was found to have fraudulently billed Modifier 78 would have presented the emergency circumstances that would have necessitated an operation to take place outside of the operating room.  Indeed, as Dr. Ross testified, it is a surgeon's preference to operate in an operating room because of the resources and equipment available:

> The pros [of operating in an operating room] are you have light.  You have got an anesthesiologist.  You can be working here and somebody can stop breathing over there.  When you have an anesthesiologist there, they are taking care of that.  They are maintaining airway.  They are maintaining, checking the blood pressure.  So you have other staff in the room.
>
> You have got hundreds of instruments which I can't even remember all the names for.  Any instruments you need are there.  And when you are at the bedside, you are only going to have a handful of tools unless you bring them with you or you order a setup to come up into the room.  So you have lighting.  You have a trained personnel.  You have staff.  You have anesthesia.  The operating room, as one of my old partners used to say, that's the place to be.

(Tr. at 377-78.)  Although Defendant is correct that multiple witnesses, including Dr. Ross, acknowledged that the Indictment Procedures could be conducted at the bedside, such surgeries would be conducted only in rare circumstances "when either there's a limited amount of time or the amount of time it would take the patient to go to the operating room might be too long or transporting the patient might be uncomfortable or the patient might be just too sick to have anesthesia."  (Tr. at 378.)

Dr. Ross further testified that, even if one of the Indictment Procedures was conducted at the patient's bedside, several pieces of medical documentation still would be generated, including an operative note and documentation noting the patient's consent.  (Tr. at 375-77.)  Defendant

24

argues that the government erred by not consulting the patients' medical files as part of the Modifier 78 Analysis, contending that those files would reveal documentation supporting bedside procedures. Tellingly, however, out of the thousands of pages of medical records produced at the trial by the government, Defendant did not point to any instances in which (i) Defendant billed for Modifier 78, and (ii) no operating room log existed, but (iii) the medical documentation clearly supported Defendant's performance of the stated Indictment Procedure outside of an operating room. The closest Defendant ever came to challenging a specific claim was to show that he had seen a particular patient on the same day that he billed one of the Indictment Procedures. (*See e.g.*, Tr. at 661-62, 802.) However, Defendant did not point to any evidence to suggest credibly that any of the Indictment Procedures billed actually were performed at the bedside during those patient visits. Without concrete evidence to credit Defendant's argument, the jury reasonably could accept the government's analysis in its entirety.

It is worth noting that, even if one were inclined to discount a portion of the Modifier 78 Analysis because the government did not take into account the possibility of surgeries conducted under exigent circumstances, Defendant would have had to conduct *hundreds* of the procedures for which no operating room log exists. To be more precise, in order to find enough "clean" money to clear even one of the two $1 million transfers under the strict tracing requirement that is now defunct pursuant to *Silver 2017*, Defendant would have had to have performed approximately 360 of the 6,121 Modifier 78 procedures determined by Agent Giambalvo to be fraudulent.[12] In order to clear both of the transfers, Defendant would have had to have performed approximately 2,900

---

[12]    Under "strict tracing," in order to have enough clean money to cover $990,001 of the first $1 million transfer, an additional $140,834 would need to be clean, added to the $849,167 already presumed clean. Using the average payment for one of the Modifier 78 Indictment Procedures ($2,403,839.59/6,188 = $388.47), this equates to approximately 363 additional procedures.

additional procedures—that is, *nearly half* of all procedures for which no operating room log exists.[13]  Given these numbers and the lack of evidence presented that Defendant performed so many surgeries under extraordinary conditions at the bedside, the jury could properly find that the government met its burden as to the jurisdictional amount.[14]

Finally, the Court reiterates that, even if the Court were not to credit the Modifier 78 Analysis in its entirety (which it does), Defendant's Motion must be denied in light of *Silver 2017*, which adopted the reasoning used by this Court at the conclusion of the government's case in ruling that strict tracing was not required to prove violations of 18 U.S.C. § 1957.  *See Silver 2017*, 2017 WL 2978386, at *9-10.  Accordingly, Defendant's Motion is denied on both bases.

## II.    The Government's Forfeiture Motion

### A.  Legal Standard

Federal Rule of Criminal Procedure 32.2 provides, in relevant part:

> A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute.  The notice should not be designated as a count of the indictment or information.  The indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks. . . .  If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.  If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

---

[13]      In order to have enough clean money to cover $1,990,001 for both transfers, an additional $1,140,834 would need to be clean, added to the $849,167 already presumed clean.  Using the average payment for one of the Modifier 78 Indictment Procedures ($388.47), this equates to approximately 2,937 additional procedures.

[14]      In crediting the Modifier 78 Analysis, the Court notes that it also agrees with the government that Defendant's unnecessary use of Modifier 78 in connection with CPT code 11005, which has no global period, is consistent with Defendant's overall scheme of fraudulently billing Modifier 78.  (Gov't Mot. at 11 n.2.)  In doing so, the Court rejects Defendant's contention that the superfluous use of Modifier 78 with this CPT code is evidence of Defendant's mistaken use of the modifier.  (*See* Nov. 18, 2016 Tr. at 35-39.)

FED. R. CRIM. P. 32.2(a)-(b). "Criminal forfeiture under [18 U.S.C. § 982] is a form of punishment, separate and apart from any restitutive measures imposed during sentencing. . . . A court's discretion in ordering criminal forfeiture is cabined by the Eighth Amendment's Excessive Fines Clause. The amount of forfeiture 'must bear some relationship to the gravity of the offense that it is designed to punish.'" *United States v. Peters*, 732 F.3d 93, 98-99 (2d Cir. 2013) (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

Two separate subsections of § 982 govern the Court's forfeiture calculation in this case. First, pursuant to § 982(a)(7), "[t]he court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." *Cf. United States v. Jafari*, 85 F. Supp.3d 679, 685 (W.D.N.Y. 2015), *aff'd*, No. 15-556-CR, 2016 WL 5340280 (2d Cir. Sept. 22, 2016) ("There is a paucity of case law addressing forfeiture in the context of health care fraud under § 982(a)(7), but those courts that have addressed the issue have held that forfeiture is authorized in the form of a personal money judgment.") In turn, 18 U.S.C. § 24(a)(1) defines "Federal health care offense" to include violations of 18 U.S.C. §§ 1035 and 1347, which were the statutory bases for Defendant's convictions of Counts One through Four. The government seeks a forfeiture money judgment as to those counts "representing the gross proceeds of the defendant's health care fraud scheme." (Gov't. Mot. at 6.) The government also seeks forfeiture of all of the Forfeitable Assets because they are traceable to the gross proceeds of Defendant's fraud. (*Id.*; *See* p. 16, *supra*.)

Second, with respect to Defendant's convictions for money laundering under 18 U.S.C. § 1957, the court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C.

27

§ 982(a)(1).  The only funds subject to forfeiture under this provision are those contained in the JPMC 8506 Account and the Signature Account.  (*See* p. 16, *supra*.)

The government bears the burden of establishing the amount to be forfeited by a preponderance of the evidence.  *United States v. Gaskin*, 364 F.3d 438, 461 (2d Cir. 2004) ("Because criminal forfeiture is viewed as part of the sentencing process, the government need prove facts supporting forfeiture only by a preponderance of the evidence.") (internal citations omitted).  In making its forfeiture calculation, the Court may rely "on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable."  FED. R. CRIM. P. 32(b)(1)(B); *See United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007) (finding nothing in the Federal Rules of Evidence nor any other rule prohibited the admission of hearsay at a forfeiture hearing).

## B. Defendant's Opposition to the Government's Motion

Defendant opposes the Government's Motion on a variety of grounds.  Initially, Defendant argues that the government is not entitled to any money judgment whatsoever because it failed to provide the notice required by Federal Rule of Criminal Procedure 32.2.  (Def. Opp. at 3-4.) Defendant next takes issue with the government's calculation of the forfeiture amount, arguing that:  (i) the evidence presented at trial demonstrates that Defendant performed some of the Class I procedures; (ii) the methodology used to calculate Class II and III Claims is erroneous because it wrongly assumes that an operating room log must exist for every procedure that can be billed using Modifier 78; and (iii) the extrapolation of the Modifier 78 Analysis to the Class III Claims is improper because no direct evidence was presented at trial that these claims are fraudulent.  (Def. Opp. at 4-18.)  Defendant also argues that forfeiture of the Forfeitable Assets is not warranted because, as discussed in more detail in Defendant's Motion, the government did not meet its

burden in proving that the amounts seized were derived from Defendant's health care fraud. (Def. Opp. at 18.)

### C. Application

#### 1. Notice of Intent to Seek Forfeiture

Defendant argues, as a threshold matter, that the government is not entitled to a money judgment because it failed to provide notice of its intent to seek one in the Indictment. (Def. Opp. at 3-4.) However, Rule 32.2, which Defendant quotes in support of his argument, contains no such requirement; it requires only that an indictment "contains notice to the defendant that the government will seek the forfeiture of property as a part of any sentence in accordance with the applicable statute." FED. R. CRIM. P. 32.2(a). Here, the notice provided clearly was sufficient as the Indictment tracked the precise language of Rule 32.2 in informing Defendant that the government intended to seek forfeiture as to Counts One through Four (Indictment at ¶¶ 23-24), and separately, as to Counts Five and Six (*Id.* at ¶ 25). The Indictment even lists the specific property it seeks to forfeit (*Id.* at ¶¶ 23-25), even though this is not required expressly by Rule 32.2, FED. R. CRIM. P. 32.2(a) ("The indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks."). The Indictment goes on to makes clear that the property the government intends to seek "include[es], but is not limited to" the property listed. (Indictment at ¶¶ 23, 25.)

The cases cited by Defendant to support this non-existent requirement are inapposite as, in each case, the court found an indictment to be acceptable when it contained information about a money judgment. (Def. Opp. at 3.) However, Defendant has not pointed to any authority (and the Court is not aware of any) suggesting the government should be precluded from seeking forfeiture when notice of intent to seek a money judgment was not contained in an indictment. The

government correctly points out that courts in other circuits have expressly found otherwise, and this Court agrees with the reasoning of those opinions. *See, e.g.*, *United States v. Lo*, 839 F.3d 777, 791 (9th Cir. 2016) ("The government is not legally required to notify a defendant that it is seeking a money judgment; indeed, Rule 32.2(a) states that the government '*need not identify* the property subject to forfeiture or specify the amount of a money judgment.' Because Lo was not entitled to notification that the government was seeking specific property, the government's decision to seek a money judgment instead of the listed property does not render the government noncompliant with the statute.") (quoting FED. R. CRIM. P. 32.2(a)) (emphasis added in *Lo*).

### 2. Calculation of the Forfeiture Money Judgment

As set forth above, the statutes under which the government seeks forfeiture *require* the Court to order forfeiture under the circumstances provided. *See United States v. Monsanto*, 491 U.S. 600, 607 (1989) (finding that statute setting forth that a court "'shall order' forfeiture of *all* property described" means that forfeiture is "mandatory in cases where the statute applied") (emphasis in original). With respect to health care fraud offenses, 18 U.S.C. § 982(a)(7) permits the government to obtain "property, real or personal, that constitutes or is derived . . . from the gross proceeds" resulting from the fraud in the form of a money judgment. *United States v. Poulin*, 690 F. Supp.2d 415, 425 (E.D. Va. 2010), *aff'd*, 461 F. App'x 272 (4th Cir. 2012) ("The statute's reference to real or personal property constituting 'gross proceeds' reflects a Congressional intent for government to be able to obtain money judgments against such health care offense defendants rather than having the term 'property' interpreted strictly to include only real property (*i.e.*, land) and personal property (*e.g.*, any movable property, or intangible property, such as bank accounts, other than real property).")); *See Jafari*, 85 F. Supp.3d at 687.

In calculating a money judgment for a scheme, as opposed to a discrete violation of a statute, the court may order forfeiture for "additional executions of the scheme not specifically charged as substantive counts, but which fall within the boundaries of the overall scheme." *United States v. Capoccia*, 503 F.3d 103, 117 (2d Cir. 2007) (quoting *United States v. Boesen*, 473 F. Supp.2d 932, 952 (S.D. Iowa 2007) (finding that a defendant convicted of health care fraud must forfeit the proceeds uncharged executions of the scheme)); *accord. United States v. Jafari*, — Fed. Appx. —, 2016 WL 5340280, at *5 (2d Cir. Sept. 22, 2016) (applying *Capoccia* and finding it "defeats Jafari's challenge to an order requiring her to forfeit the unlawful proceeds of uncharged and acquitted conduct found by a preponderance to have been committed in furtherance of the proved health-care scheme"). In addition, because the statute calls for forfeiture of "gross" and not "net" proceeds, Defendant is not entitled to receive the value of the procedures he conducted that were upcharged, or billed as a more expensive procedure. *Jafari*, 85 F. Supp.3d at 687 ("In other words, Defendant has no right to apply a set-off for the amount she would have received had she billed properly for services actually rendered.").

In calculating the final money judgment, the court is mindful that "[t]he calculation of forfeiture amounts is not an exact science," and that the "court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." *Treacy*, 639 F.3d at 48 (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir.2009)). "A court is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Treacy*, 639 F.3d at 48. "Although the total amount of forfeited assets may be determined by 'conservatively estimating' the revenue regularly collected or received, the

31

evidence of such revenue may not be overly speculative." *United States v. Basciano*, 2007 WL 29439, at *2 (E.D.N.Y. Jan. 4, 2007) (quoting *United States v. Corrado*, 227 F.3d 543, 555 (6th Cir. 2000)).

Below, the Court applies these principles to each class of Medicare claims asserted by the government in order to arrive at a final forfeiture money judgment.

### a.  Class I Claims

The government seeks $898,923.40 for the Class I Claims, which cover Defendant's billing of the Indictment Procedures on the Featured Patients over the Indictment Period.  (Gov't. Mot. at 24-26.)  Defendant takes issue with the government's methodology, arguing that it "ignores evidence demonstrating that Dr. Ahmed did perform at least some procedures on the Enumerated Patients, and its reliance on the testimony of Dr. Ross and the medical records to justify forfeiture for seven of the [Featured Patients] is misplaced." (Def. Opp. at 4-5.)  In primary support of his argument, Defendant points to certain testimony regarding patients Elwood Verity, Evon Blackwood and Alfreda Brewster suggesting that Defendant may have seen these patients and performed some of the Indictment Procedures billed.  (Def. Mot. at 5-7.)

The Court is not convinced that any of the testimony cited demonstrates that Defendant performed any Indictment Procedures.  As to Mr. Verity, although Defendant correctly quotes Mr. Verity's testimony indicating that "it's possible [he] saw" and was treated by Defendant (Tr. at 1183), nothing else in his testimony suggests that Defendant performed any of the procedures Mr. Verity was billed relating to his January 2013 hospital stay.  Mr. Verity testified that he was hospitalized after he experienced inflammation of his legs resulting from cellulitis, a condition that has caused Mr. Verity to visit a hospital several times.  (Tr. at 1179-80.)  During his prior hospital visits, Mr. Verity noted that his treatment consisted of having his legs treated with ointment and

wrapped in a gauze known as an "Unna boot." (Tr. at 1180.)  Mr. Verity testified that his January 2013 treatment was no different and specifically confirmed that no incisions were made on him during that hospital stay.  (Tr. at 1181.)  He also confirmed that treatment was limited to his legs and that no procedures were conducted on his lower back or his feet.  (*Id.*)  This testimony directly contradicts Defendant's billing Medicare for five Indictment Procedures per day, for five days in a row to Mr. Verity's lower back, trunk, legs and feet.  (*See* GX 77O.)  Even if Dr. Ahmed saw Mr. Verity (and no evidence was presented that he had), Mr. Verity's credible testimony directly contradicts Defendant's billing.[15]

Defendant's arguments as to Mr. Blackwood and Ms. Brewster also have no merit, as a review of Defendant's billing reveals that the government properly extracted all non-Indictment procedures from its money judgment calculation as to the Class I Claims.  With respect to Mr. Blackwood, Defendant asks the Court to consider the fact that some Indictment Procedures could have been performed on Mr. Blackwood because the main procedure performed (treatment of an anal fistula) was on an area of the body where he could not see what Defendant was doing.  (Def. Mot. at 5-6.)  Defendant posits that it is possible, therefore, that Defendant applied local anesthesia to Mr. Blackwood and performed the Indictment Procedures that he billed.  (*Id.*)  Even if the Court were to lend some credence to this theory, the Court finds it inconceivable that 13 such procedures were performed, on four separate visits, on Mr. Blackwood's hips or knees without his knowledge or consent, and without any documentation.  Indeed, it is much more consistent with Defendant's scheme to have billed all the Indictment Procedures as to Mr. Blackwood without having performed a single one.

---

[15]    As Dr. Ross testified there is a separate billing code (29580) for application of a Unna boot on a lower extremity.  (Tr. at 627; GX 101 at 489.)

33

Importantly, the government's Class I calculation omits the six claims Defendant billed Mr. Blackwood that are consistent with his treatment of his anal fistula.  (*See* GX 77C; *cf.*, GX 101 at 688 (CPT code 45905 defined as "Manipulation—Dilation of anal sphincter"), 690 (CPT code 46275 defined as "[S]urgical treatment of anal fistula (fistulectomy/fistulotomy); subcutaneous—intersphincteric").)  Similarly, as to Ms. Brewster, the government's forfeiture calculation would allow Defendant to retain the proceeds from the chemotherapy catheter procedure, which both parties acknowledge Defendant performed as billed.  (*See* GX 77D; pp. 6-7, *supra*.); *cf.*, GX 101 at 595 (CPT code 36561 defined as "Insertion of Central Venous Access Device—age 5 years or older").)

Defendant also argues with respect to Ms. Brewster, that her daughter, "Ms. Rollins[,] testified that Dr. Ahmed did not treat her mother," and suggests if Ms. Rollins was mistaken about the doctor who performed her mother's procedure, she may be mistaken about other surgeries performed on her mother.  (Def. Opp. at 6.)  However, Defendant misrepresents the testimony of Ms. Rollins, who was clear throughout that she did not recall the name of the surgeon who operated on her mother:

> Q.  And I think -- as you sit here today, do you recall the name of the surgeon who performed that procedure?
>
> A.  No.
>
> Q.  It was three and a half years ago, approximately?
>
> A.  Yes.
>
> . . .
>
> Q.  And do you see the name of the doctor who is listed as the surgeon?
>
> A.  Yes, I do.
>
> Q.  And who is that?
>
> A.  Dr. Syed Ahmed.

Q. Does seeing this document refresh your recollection that it was Dr. Ahmed who performed the surgery or does it not?

A. No.

(Tr. at 1157-59.) This testimony does not discredit Ms. Rollins' recollection of her mother's stay in the hospital, but rather demonstrates her care in answering Defendant's attorney's questions at trial. Defendant's feeble attempt to discredit Ms. Rollins does nothing to persuade the Court that any of the Indictment Procedures billed as to her mother, or any of the other Featured Patients, were actually performed.

Defendant's remaining arguments as to the Class I Claims are also unavailing. Defendant primarily challenges Dr. Ross's review of the medical documentation, and the reliability of the documentation itself. (Def. Opp. at 7-18.) As an initial matter, the Court finds that Dr. Ross's review of the medical files for five of the seven patients for whom there was no witness testimony was sufficient to establish by a preponderance of the evidence that Defendant did not bill any of the Indictment Procedures on those patients. Although there is no doubt that defense counsel elicited testimony demonstrating apparent inconsistencies in the medical documentation, none of the evidence regarding the inconsistencies suggests that Defendant may have performed even one of the Indictment Procedures on these patients.

With respect to the other two patients for whom no witness testimony was presented, the existence of progress notes in Defendant's handwriting does not move the needle. For these patients, Steven Draga and Nunes Buchanan, Defendant argues that the progress notes are evidence the Indictment Procedures were performed. (Def. Opp. at 10-11.) However, a review of these illegible notes alongside Defendant's claims history suggests that these notes are much more likely to be associated with the claims for which the government does not seek forfeiture. For example, as to Mr. Draga, Defendant billed Medicare for four days in a row for CPT Code 99233, which is

35

defined as "[s]ubsequent hospital care, per day, for the evaluation and management of a patient . . . ." (GX 101 at 28; GX 77I.)  The government is not entitled to, and does not seek, forfeiture over those claims, nor any other non-Indictment Procedure claims.  However, the government is entitled receive the proceeds for the 60+ Indictment Procedures as to Mr. Draga for which there is no supporting documentation.

Finally, Defendant argues that he is entitled to retain the proceeds for 19 procedures for which Dr. Ross concluded that corresponding operating room logs exist and support a claim for a wound care procedure.  (Def. Opp. at 9-10.)  The Court finds this to be Defendant's strongest argument as to the Class I Claims because it is the only direct evidence presented demonstrating that Defendant actually was present in an operating room performing a wound care procedure on one of the Featured Patients.  Nevertheless, this argument also fails, as the Court credits Dr. Ross's conclusion that each of these procedures was upcharged.  (*See* Gov't. Mot. at 19-21.)  Taking one example, Defendant submitted five claims as to Mr. McGurk on August 19, 2011, for procedures completed on his hip, legs, feet and back.  (GX 77J.)  The operative report completed for that day does indicate that multiple incisions were made in those areas and specifies that the procedure was "performed to the muscle level."  (Tr. at 480, 718; *See* GX 77J.)  However, the five procedures billed are more complicated, and more expensive, surgeries that either require deeper incisions and/or involve more sensitive or inaccessible areas, like the spinal column or hip joint.  (GX 77J; *See* Tr. at 398, 495-96, 452-53, 527-28, 643-33.)  According to Dr. Ross, who was the only testifying medical expert witness at trial, the appropriate billing code for the procedure Defendant performed on August 19, 2011, is 11043, which is defined as a "Debridement, muscle and/or fascia . . . ."  (GX 101 at 329.)  The government correctly points out that Dr. Mary Ann Bilotti, who testified at trial about a wound debridement procedure performed on another featured patient

named Margaret Albano, noted that she billed the related "Debridement" CPT code 11044 when performing that procedure to the bone level. (Tr. at 1723.) Medicare paid Dr. Bilotti approximately $200 to $215 for performing that procedure (Tr. at 1723), whereas the more complicated procedures that Defendant billed ranged from $343.50 to $902.21 (GX 77J; *See also* Gov't. Mot. at 20 & Ex. D).

In crediting Dr. Ross's testimony as to these 19 procedures, the Court necessarily rejects Defendant's contention that Dr. Ross's testimony was outside the scope of his expertise. (Def. Opp. at 9-10.) At trial, the Court accepted Dr. Ross as an expert in "wound care and general surgery," which, in this Court's view, carries with it knowledge of how to bill certain procedures. Moreover, Defense counsel had the opportunity to cross-examine Dr. Ross on his billing knowledge, and indeed, spent a significant portion of his examination probing Dr. Ross's own billing practices. (Tr. at 624-49.) The Court finds no convincing evidence in the record to suggest that Dr. Ross's conclusions as to the appropriate billing codes are incorrect.

The Court also recognizes that, in ordering forfeiture for claims for which there is no dispute that Defendant performed a wound care surgery means that the government will receive proceeds for services Defendant actually provided. However, as discussed above, the Court views the case law interpreting 18 U.S.C. § 982(a)(7) to be clear that Defendant is not entitled retain the value of the procedure actually performed. *See Jafari*, 85 F. Supp.3d at 687 ("In other words, Defendant has no right to apply a set-off for the amount she would have received had she billed properly for services actually rendered."). Indeed, Defendant does not appear to object to the government's calculation on that basis. (*See generally* Def. Opp.)

Therefore, for the reasons discussed above the Court finds Defendant must forfeit $898,923.40, which represents the entire amount the government seeks for the Class I Claims.

### b.  Class II Claims

The government seeks $2,191,120.70 for the Class II Claims, which is the total of all claims reviewed by Agent Giambalvo as a part of the Modifier 78 Analysis discussed at Background § B.3, pp. 10-12, *supra*, that were deemed fraudulent because no operating room log existed. (Gov't. Mot. at 24-25.)   As discussed above in connection with Defendant's Motion, *See* Discussion § I.B, pp. 21-26, *supra*, the Court finds that the Modifier 78 Analysis was a proper basis upon which the jury could have found beyond a reasonable doubt that the government satisfied the requirements of 18 U.S.C. § 1957 for Counts Five and Six.  As the government enjoys a lower burden of proof for establishing a forfeiture amount, the Court finds that, for the reasons discussed in Discussion § I.B, pp. 21-26, *supra*, the Modifier 78 Analysis is a proper method of establishing an amount for the Class II Claims.  The Court notes in this regard that it has considered all arguments Defendant made in connection with Defendant's Motion and the Government's Motion as to why the Court should not credit the Modifier 78 Analysis.

Therefore, for the reasons discussed here and in Discussion § I.B, pp. 21-26, *supra*, the Court finds Defendant must forfeit $2,191,120.70, which represents the entire amount the government seeks for the Class II Claims.

### c.  Class III Claims

The government seeks $4,480,398.09 for the Class III Claims, which the government calculated by extrapolating the results of the Modifier 78 Analysis to claims on other remittance statements that were not reviewed by Agent Giambalvo.  (Gov't. Mot. at 25-26.)   The government's calculation uses Agent Giambalvo's conclusion that only 1% of the Class II Claims were legitimate procedures for which an operating room log existed, and extrapolates that percentage to the remaining Modifier 78 claims.  The Class II Claims represents 36% of all

Modifier 78 claims, but were all contained on remittance statements issued over a five-week period in July and August 2013.[16]  (*See* Gov't. Mot. at 23.)  The Class III Claims represent the remaining 64% of all Modifier 78 claims that were contained on all other remittance statements issued during the Indictment Period.  (*Id.*)

As the Court made clear during the November 18, 2016 oral argument on the parties' motions, the government's extrapolation is troubling for a variety of reasons, including:  (i) the size of the sample; (ii) that the sample was drawn from a specific time period and was not drawn randomly from across the entire Indictment Period; and (iii) the lack of any independent corroboration of the extrapolation's reliability.  (Nov. 18, 2016 Tr. at 44-48.)  The Court also expressed dismay that the Modifier 78 Analysis apparently was started so close to trial that the government did not have time to conduct a review of all claims.  (*Id.*)  As the government's response to these concerns at oral argument has not satisfied the Court fully, additional briefing of the issue was requested.

Although the government observes correctly that "[t]he calculation of forfeiture amounts is not an exact science," and that the Court may "make reasonable extrapolations from evidence established by a preponderance of the evidence at the sentencing proceeding" (*Id.* at 7, 8 (quoting *Treacy*, 639 F.3d at 48), the government has not provided enough information to convince the Court that the extrapolation made here is, in fact, a reasonable one.  While case law in this area is sparse, *See Jafari*, 85 F. Supp.3d at 685, the Court is persuaded by the rationale in *United States v. Skodnek*, 933 F. Supp. 1108 (D. Mass. 1996), cited by Defendant in his opposition (Def. Opp. at 16-17).  In *Skodnek*, the court assessed an extrapolation methodology similar to that at issue

---

[16]     As noted above, *See* p. 11 n.6, *supra*, Medicare paid Defendant with a single check on July 15, 2013 for 23 of the 29 remittance statements issued during this five-week period.  (Tr. at 1782.)  The Court recognizes, therefore, that the sample assessed by Agent Giambalvo relates to far more than five weeks of claims.

here, where the government extrapolated "generally from the known losses to unknown losses based on process of assuming a certain rate of fraudulent [Medicare] billing." (*Id.* at 1114.) Specifically, the government determined the rate of upcoding from a known sample and then "assume[d] that the rate of fraud to have existed—in a consistent manner—throughout the total universe of Skodnek's billings, during a period extending three years before the period covered in the superseding indictment to one year after that period." *Id.* The court ruled that there was not a sufficient basis upon which to order forfeiture, because, among other reasons, it required the Court to find that the defendant's "illegal activities never ebbed and flowed" over the period at issue. *Id.* at 1117. The court reasoned that "[t]he issue is not merely whether this Court believes it more probable than not that Skodnek engaged in fraudulent practices resulting in losses beyond what is covered in the confirmed loss category. The issue is whether this Court has been presented with sufficiently reliable data upon which to gauge the extrapolated loss amount. The Guidelines require this degree of care." *Id.*

One court within this district similarly has concluded that, even a "statistically valid random sample" of Medicare claims was too speculative from which to extrapolate because medical cases "vary too much" and it would require a "medical discussion" of every one of the claims to determine a proper forfeiture amount. Dec. 10, 2012 Sentencing Tr., *United States v. Sachakov*, No. 11-cr-120 (E.D.N.Y. Apr. 1, 2013), Dkt Entry No. 187, at 20-21. In that case, the court ultimately ordered the defendant to forfeit only $1.1 million of the government's initial $6.6 million forfeiture request. *Compare Id.* at 41 *with United States v. Sachakov*, 2013 WL 101287, at *2 (E.D.N.Y. Jan. 8, 2013).

Here, the government has not set forth a reliable basis upon which this Court can conclude that the 1% rate of legitimate procedures found for the Class II Claims carries across the entire the

Indictment Period. Indeed, during the forfeiture hearing, Agent Giambalvo conceded that he would have no idea whether the rate holds true for other remittance statements because he "didn't do that analysis" (Forfeiture Tr. at 75), and the government presented no other witness to attest to the reliability of using the Class II Claims as a sample for all Modifier 78 claims.[17] The best the government could muster at the November 18, 2016 oral argument was to reference "some sample size calculators" that it found online the night before indicating that to get a 95% confidence level, the government would need to take a sample of only 376 (2%) of the 17,331 total Modifier 78 claims (in Class II, they assessed 36%). (Nov. 18, 2016 Tr. at 47.)[18] This response missed the point, as the government never explained—through an expert or otherwise—how a sample taken from a single, short period in time could be extrapolated reliably over a much longer period. If, for example, Defendant's fraud increased over time or fluctuated wildly throughout the Indictment Period, the sample may not accurately capture the true rate of fraud.

A review of the spike data is instructive. *See* pp. 8-9, *supra*. The chart summarizing this data shows that Defendant's billing of the Indictment Procedures varied over the entire Indictment

---

[17]    Although the rationale behind the government's decision to review only a sample of Defendant's Modifier 78 claims was not revealed, it appears to have been motivated, at least in part, by the fact that the analysis was not started until a month before the trial actually began, despite the trial having been scheduled to begin much earlier originally. (*Id.* at 76.)

[18]    The government referenced a 95% confidence interval in its initial brief, but failed to provide any background as to how it came up with that figure. (Gov't. Mot. at 25 n.6.)

Period.  *See* GX 74B.[19]  If one were to use a two-month sample of this data to calculate the total number of Indictment Procedures Defendant billed, the extrapolation would change drastically if the sample used was April through May 2012 (when Defendant's billings appear to be at their lowest), as compared with January through February 2013 (where Defendant's billings appear to be at their highest).  It stands to reason that if the number of Indictment Procedures billed fluctuated so drastically, the *rate* of fraudulent Modifier 78 claims also may have changed over time.  The Court requires additional information in order to make this determination.

In finding that the extrapolation made here is too speculative, the Court has considered the government's counterarguments.  (*See* Gov't. Mot. at 22-23, 25-26; Gov't. Reply at 8-9.)  The Court notes in this regard that it agrees with the government that the fraud at issue in both *Skodnek*

---

[19]    In GX 74B (below), the lower blue line represents the number of unique patients for whom Defendant billed an Indictment Procedure each month.  (Tr. at 1068-69.)  The orange line represents the total number of Indictment Procedures Defendant billed each month.  (Tr. at 1069.)



and *Sachakov* appears to pale in comparison to the flagrant and widespread fraudulent scheme perpetrated by Defendant in this case. Nevertheless, the Court does not agree that the level of egregiousness of Defendant's conduct dispenses with the government's burden to prove a forfeiture amount by a preponderance of the evidence, a relatively low burden. *See Skodnek*, 933 F. Supp. at 1120. This is especially true where, as here, the extrapolation would more than double the forfeiture amount.

In sum, the Court finds that the government has not established by a preponderance of the evidence that a full 99% of the Class III Claims were fraudulent. In order to inform how much, if any, of the Class III Claims Defendant will forfeit, the parties shall set forth their position as to Class III Claims forfeiture in their sentencing memoranda. In making their arguments, the parties are to assume the Court accepts the Class II Modifier 78 Analysis. The Court reluctantly will permit the government to submit a declaration from Agent Giambalvo, or a similarly situated HHS employee, setting forth the results of a remittance-statement-to-operating-room-log analysis conducted over the 64% of Modifier 78 claims not yet reviewed. Although this analysis should have been conducted prior to the forfeiture hearing, the Court believes that determining an accurate Class III forfeiture amount is important enough to justify a short delay in scheduling Defendant's sentencing. If the government cannot conduct such an analysis in a timely fashion, the government shall explain why. In lieu of a declaration from an HHS employee, the government may submit an expert declaration, or set forth any other information it has, to demonstrate why using the Class II fraud rate can be extrapolated reliably to the Class III Claims. Defendant will have the opportunity to counter the government's submission.

### 3. Assets to be Forfeited

Finally, the government requests that the Court order Defendant to forfeit each of the Forfeitable Assets. (Gov't. Mot. at 26-28.) Defendant's only argument in opposition relies on this Court's rejection of the Modifier 78 Analysis (Def. Opp. at 18), which it has declined to do (*See* Discussion §§ I.B, II.C.2.b, pp. 21-26, 38, *supra*). For the reasons set forth in the Government's Motion (Gov't. Mot. at 26-28), the Court agrees that each of the Forfeitable Assets is subject to forfeiture and may be credited towards the money judgment ultimately ordered.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for a new trial or verdict of acquittal is denied in its entirety and the Government's Motion for forfeiture is granted, in part. The Court finds the Defendant is liable for and must forfeit at least $3,090,044.10, which represents the entire amount sought by the government for the Class I and Class II Claims. The Court will determine the additional amount Defendant must forfeit, if any, at the time of sentencing. As set forth above, Discussion § II.C.2.c, pp. 38-43, *supra*, the parties' sentencing submissions shall address the concerns raised by the Court regarding the government's calculation of the Class III forfeiture amount. A sentencing scheduling order will issue separately.

SO ORDERED.

Dated:  Brooklyn, New York
        July 25, 2017

_____
         /s/
      DORA L. IRIZARRY
        Chief Judge
