

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

WK/ABS:FTB/PAN/DJ        *271 Cadman Plaza East*
F. #2013R01395            *Brooklyn, New York 11201*

December 28, 2017

By ECF

The Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. Syed Imran Ahmed
            Criminal Docket No. 14-CR-277 (DLI)

Dear Chief Judge Irizarry:

The government respectfully submits this sentencing letter regarding the defendant Syed Imran Ahmed, who is scheduled to be sentenced on January 12, 2018 at 10:00 a.m. On July 28, 2016, following a three-week trial, a jury found the defendant guilty of all six counts of the indictment – specifically, one count of health care fraud, in violation of 18 U.S.C. § 1347 (Count One); three counts of submitting false statements relating to health care matters, in violation of 18 U.S.C. § 1035 (Counts Two through Four); and two counts of engaging in money laundering transactions, in violation of 18 U.S.C. § 1957 (Counts Five and Six).

The Presentence Investigation Report prepared by the U.S. Probation Department in this case (the "PSR") computed a total offense level for the defendant's conduct under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 36, which corresponds to a range of imprisonment of 188 – 235 months. As set forth below, the government respectfully submits that the Guidelines range calculated in the PSR is correct and requests that, in light of the defendant's conduct and his history and characteristics, the Court impose a sentence at or above the applicable Guidelines range. In light of the Court's Opinion and Order dated July 25, 2017 (the "Post Trial Order"), and for the reasons stated in the government's filings seeking an order of forfeiture dated September 1, 2017 (Docket Entry #218) and October 30, 2017 (Docket Entry #224), the government also requests that the Court enter an order of restitution in the amount of $7,266,008.95, and an order of forfeiture in the amount of $7,266,008.95.

I.     Background

A.     The Defendant

The defendant, a licensed medical doctor, is a general surgeon who was enrolled in the Medicare program ("Medicare") and submitted claims for reimbursement to Medicare for surgical services.  (PSR ¶ 9).  Between approximately January 1, 2011 and December 31, 2013, the defendant held privileges at several hospitals in New York, including Kingsbrook Jewish Medical Center, Mercy Medical Center, Wyckoff Heights Medical Center, and Franklin Hospital.  (Id.; Trial Tr. at 1628:6-1628:15).   For the surgeries that he performed at these hospitals for Medicare beneficiaries, the defendant submitted claims for reimbursement to Medicare Part B.

B.     The Health Care Fraud Scheme

The defendant fraudulently billed Medicare approximately $85 million by engaging in a pattern of false billing involving 11 Current Procedural Terminology ("CPT") codes ("11 CPT Codes") and CPT modifier code 78 ("Modifier 78").  (PSR ¶ 12).  The defendant, using the 11 CPT codes, billed Medicare for surgeries, such as wound debridement and incision-and-drainage ("I&D") procedures, which he did not perform.  The defendant frequently billed multiple such procedures on the same patient on the same day.  (Id. at ¶ 14).  According to the fraudulent billing, the defendant repeated those multiple, daily procedures on the same patients for days, weeks, and sometimes months at a time.  (Id.).

When reimbursing for covered surgical procedures, Medicare makes one lump-sum payment for what it defines as the "global surgical package."  (Trial Tr. at 139:6-139:18; Post Trial Order at 3-5).  This payment is intended to compensate the physician for not just the procedure itself, but also pre-operative visits, the management of complications within the post-operative period, pain management by the physician, and such things as dressing changes and local incisional care.  (Id. at 147:3-147:18; Gov't Ex. 33; Post Trial Order at 4-5).  Each covered surgery is usually assigned a specific time period within which the services just described are not considered separately reimbursable by Medicare because payment for those services has already been factored into the payment for the global surgical package.  (Id.).  With the exception of CPT code 11005, the 11 CPT codes primarily at issue in this case had global periods for 10 or 90 days during which any routine post-operative care was not separately reimbursable from the procedure itself.  See Gov't Ex. 34 (listing the respective global periods for the 11 CPT Codes).

The defendant circumvented the restrictions on billing for additional procedures during the global surgical periods by billing the overwhelming majority of these surgeries with Modifier 78 to indicate (falsely) that they took place as part of an unplanned return trip to the operating room because, in those circumstances, Medicare will make a payment for services provided within the global period.  (PSR ¶ 13-14).  This enabled the defendant to bill for multiple procedures over and over on the same patients.  During the period of January 1, 2011 to December 31, 2013, the defendant billed Medicare approximately $85 million for the 11 CPT Codes and was paid over $7 million in reimbursement for those purportedly provided services.  (Id. at ¶ 12).

For the sixteen patients whose medical records were featured at trial and presented to the jury (the "Featured Patients"), the medical documentation associated with the

2

surgeries billed by the defendant was (with only the rarest of exceptions) wholly absent from the patients' hospital files.  For example, the patients' files did not contain operative reports, anesthesia records, pathology or lab reports, completed consent forms, or nurses' notes indicating that the procedures were performed.  The government's expert, Dr. Frank Ross, testified that these types of documents and records should have been included in the patients' hospital files if the surgeries had actually been performed (and would be present even if the surgeries were performed at the patient's bedside, as opposed to a hospital's operating room). (Trial Tr. at 362:8-365:19; 375:1-377:7).  For the Featured Patients whose files he reviewed, Dr. Ross testified that these documents were either not present, indicating that the surgeries billed by the defendant had not been performed, or that the medical documentation actually showed that no such surgeries were (or could have been) performed.  See, e.g., Trial Tr. at 399:15-400:4, 409:4-412:20 (testimony of Dr. Frank Ross regarding patient John Tuomey); Trial Tr. at 414:15-414:23 (testimony of Dr. Frank Ross regarding patient Alejandro Belizaire); Trial Tr. at 428:11-428:428:21 (testimony of Dr. Frank Ross regarding patient Paul Sipos); Trial Tr. at 514:2-525:15 (testimony of Dr. Frank Ross regarding patient Mary White).  Many of the files did contain progress notes made by the defendant, but these were for the most part illegible or did not resemble the structure of an operative note.  See, e.g., Trial Tr. 407:10-409:2; 432:12-434:12; 1489:7-1490:6 (testimony of Dr. Frank Ross and Roberta Dixon regarding notes made by the defendant in certain patient files).

For other Featured Patients, the government presented testimony directly from the beneficiaries themselves, or from their relatives or friends, that the patients had not undergone the surgeries that the defendant had billed to Medicare.  See, e.g., Trial Tr. at 1111:8-1115:7 (testimony of Susan Albano regarding patient Margaret Albano); Trial Tr. at 1131:21-1135:16 (testimony of Patsy Rollins regarding patient Alfreda Brewster).  In addition, operating room logs maintained by the hospitals did not have entries corresponding to dates of services that the defendant identified as ones on which he performed surgeries on the Featured Patients as part of unplanned, return trips to the operating room.  See generally Gov't Ex. 655; Trial Tr. at 1778:19-1786:25 (testimony of Special Agent Giambalvo regarding operating room log analysis).  The defendant received a total of $898,923.40 from Medicare for claims related to services purportedly provided to the Featured Patients that were shown to be fraudulent at trial.  (Post Trial Order at 32-37).

The defendant billed Medicare using a billing company located in Michigan that was run by his brother, Syed Rehan Ahmed.  (PSR ¶ 15; Trial Tr. at 835:1-835:20, 837:11-838:24).  The defendant wrote down in longhand the CPT codes and modifiers that he wanted billed for particular patients. (PSR ¶ 14-15).  These notes were typically made on photocopies of a patient's hospital "face sheet," which is usually the first page of a patient's hospital file and contains demographic and insurance information about the patient.  (Id.).  The defendant mailed these facesheets with the handwritten notes to his brother who had his staff enter the information into electronic claims submission software to be billed to Medicare and other insurance companies. (Trial Tr. at 850:7-850:23).

Reimbursement payments from Medicare for the claimed services were directly deposited into a TD bank account ending in 5668 ("TD 5668") controlled by the defendant.  See PSR at ¶ 16; Trial Tr. at 2010:6-2010:12 (testimony of Joeseph Cincotta regarding bank account analysis).  On September 3, 2013, law enforcement questioned the defendant about his medical practice and billing procedures.  (Trial Tr. at 1627:11-1629:11).  Within a few days of that

interview, on September 9, 2013, the defendant wired $1 million from TD 5668 to an account in his name in Pakistan.  (Id. at 2013:5-2013:13).  On the same day, he wrote a check for $1 million drawn on TD 5668 and deposited it into a different, newly opened account at a different bank. (Id.).

C.    The Evidence Showing the Scope of the Scheme

As set forth in greater detail in the government's post-trial submission on forfeiture, dated September 9, 2016, Docket Entry #203 ("Gov't Forfeiture Motion"), the evidence presented at trial proved in several ways that the scope of the fraudulent scheme implemented by the defendant went well beyond the evidence related to the Featured Patients.  In particular, the claims data showed the defendant's billing of surgical procedures at volumes that were both impossibly high and far in excess of other providers.  (Gov. Forfeiture Motion at 12-15).  In addition, the operating room log analysis performed by Special Agent Giambalvo and later supplemented by Investigator Sue O'Connor, showed that the defendant routinely billed for surgeries on patients other than the Featured Patients as having taken place in hospital operating rooms with no corresponding record of those surgeries in the hospitals' operating room logs.  (Id. at 27-28).

With respect to the claims data, the government presented at trial peer review analyses that showed that the Defendant's billings for the 11 CPT Codes far outpaced those of his peers.  See Gov't Ex. 85A; Trial Tr. at 1046-47.  As the Court itself noted in the Post Trial Order, "[t]he peer comparison data revealed that Defendant led the country in billing for the [11 CPT Codes] by shocking margins."  (Post Trial Order at 8-9).  In addition, Dr. Ross testified that the number of surgeries for which the defendant submitted claims was "absurd" and not "medically possible."  See Trial Tr. at 678:2-678:16 (testimony of Dr. Frank Ross regarding patient Mary White for whom the defendant billed 653 surgeries over approximately 10 months); Trial Tr. at 679:6-679:19 (testimony of Dr. Frank Ross regarding patient John Tuomey for whom the defendant billed 73 surgeries over 17 days).

Dr. Ross also testified that it was medically inappropriate to repeat wound debridement and I&D procedures on consecutive days (Trial Tr. at 404:2-405:10), and that he had yet to see or hear of a single patient presenting with five different abscesses in need of surgery on the same day.  (Trial Tr. 396:17-396:23).  Yet, the defendant not only billed Medicare for I&D procedures on five or more abscesses on a single patient, but routinely did so for the same patients on consecutive days.  See Gov. Forfeiture Motion at 15 (chart containing several examples of this billing practice).  Dr. Ross also testified that some of the 11 CPT Codes corresponded to surgical procedures that were typically conducted by specialists, absent an emergency.  See Trial Tr. at 398:7-399:14 , 494:25-496:1 (CPT code 22015 is normally performed by a neurosurgeon because it involves penetrating the spinal column); Trial Tr. 526:23-528:6 (CPT code 27030 is normally performed by an orthopedic surgeon because it involves an incision into the hip joint).  Yet, the Defendant was the top provider in the country for both CPT code 22015 and CPT code 27030 by, as the Court noted, "astounding margins." See Post Trial Order at 8-9; Gov't Ex. 85A.

In addition to the claims data and the testimony of Dr. Ross, the government reviewed operating logs from nine hospitals and compared them to claims submitted by the defendant using the 11 CPT Codes and Modifier 78 in July and August 2013.  As explained at trial, the use of Modifier 78 advises Medicare that a procedure is "being billed as an unplanned

4

return to the operating or procedure room by the same physician following . . . the initial period of a related procedure during the post-operative period." (Trial Tr. at 143:14-143:23). Special Agent Joseph Giambalvo determined that there were no operating room logs for all but 67 (1%) of the 6,188 claims paid during the period he examined using the 11 CPT Codes and Modifier 78. See GX 655A. These 67 claims represented $28,589.66 (1%) of $2,403,839.59 paid by Medicare to Ahmed in July and August 2013 for claims billed using the 11 CPT Codes and Modifier 78. Id. In the Post Trial Order, the Court found that the operating room log analysis conducted by Special Agent Giambalvo was sound and an appropriate proxy for gauging the scope of the defendant's fraud. (Post Trial Order at 23-26, 38). The total amount of money paid to the defendant for claims included in Special Agent Giambalvo's analysis that did not relate to claims for the Featured Patients was $2,191,120.70. (Id.).

In its submissions in support of a forfeiture order dated September 1, 2017 and October 30, 2017, the government provided additional evidence from Investigator Sue O'Connor showing the application of the operating room log analysis discussed above to the remaining, relevant claims during the time period covered by the indictment. Those submissions show that the defendant received payments amounting to well over $4 million for services provided to patients, which were billed by the defendant as having taken place in an operating room, when there was no corresponding entry for a procedure on any known operating room log. In total, the defendant received over $7.2 million from Medicare for claims shown to be fraudulent, and the defendant billed the Medicare program well over $80 million in connection with those claims.

II.     The Defendant's Guidelines Range[1]

The government agrees with the Probation Department that the counts on which the defendant was convicted group for purposes of calculating the appropriate Guidelines range under U.S.S.G. § 3D1.2(d). The government also agrees that the calculation of the health care fraud Guideline governs the overall calculation, as it yields the highest offense level. The Guidelines estimate for the defendant's conduct is therefore as follows:

| | |
|---|---|
| Base Offense Level (§2B1.1(a)(2)) | 6 |
| Plus: Loss Amount More than $65 million (§ 2B1.1(b)(1)(K)) | +24 |
| Plus: Loss to Government Health Care Program More than $20 million (§ 2B1.1(b)(7)) | +4 |
| Plus: Abuse of a Position of Trust (§ 3B1.3) | +2 |
| Total: | 36 |

---

[1] The government calculated the defendant's Guidelines range using the guidelines in effect at the time of the defendant's conviction to give the defendant the benefit of revisions to the loss table in U.S.S.G. § 2B1.1 that increased the loss amounts corresponding to increases in a defendant's offense level under the Guidelines.

The applicable Guideline range for a Level 36 is 188 to 235 months' imprisonment. The major components of the above calculation are discussed below.

A.    Loss Amount

As noted in the PSR at ¶ 24, the defendant is accountable for an intended loss amount of approximately $85 million. "Loss," as used in U.S.S.G. § 2B1.1(b)(1), is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, Application Note 3(A). "Intended loss" means "(I) the pecuniary harm that the defendant purposely sought to inflict; and (II) includes the intended pecuniary harm that would have been impossible or unlikely to occur (e.g. as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." Id. Accordingly, the intended loss in this case was the pecuniary harm that was intended to result from the health care fraud offense which would be the amount billed to Medicare: specifically, $85 million. The Guidelines explicitly contemplate the scenario where a fraud defendant, knowing the insured value of an item, submits a claim beyond the value of the insured value, and considers the claim amount to be the intended loss regardless of the fact that the defendant would only be able to receive the insured value. Similarly, here, regardless of the fact that there was a Medicare fee schedule indicating what Medicare reimburses for each claim, the appropriate loss amount contemplated by the Guidelines is the billed amount.

Application Note 3(F)(viii) in the Commentary to U.S.S.G. § 2B1.1 elaborates further on the concept of intended loss in health care fraud offenses and establishes a rebuttable presumption that the billed amount is the amount of the intended loss. It states:

> In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted.

U.S.S.G. § 2B1.1, Application Note 3(F)(viii)

Accordingly, the presumption is that the loss amount is the billed amount of approximately $85 million. The Second Circuit addressed the concept of intended loss in health care cases in United States v. Singh, 390 F.3d 168 (2d Cir. 2004). In Singh, the defendant argued that he never intended or expected to receive the full amounts billed because he was aware of the rate schedules established by the various health care benefit programs to which he submitted claims. Yet, even after highlighting the fact that Singh was intimately familiar with the billing procedures based upon his testimony at trial, the Court still remanded the case for Singh "to show, if he can, that the total amount he expected to receive from the insurers was indeed less than the amounts he actually billed." Id. at 194. It follows that mere knowledge of the Medicare fee schedule, as the defendant argued in his objection to the PSR, is not enough to rebut the presumption and the defendant must make a particularized showing of what he expected to receive in order to successfully rebut the presumption. Moreover, the trial evidence showed that the defendant sought to maximize his Medicare claim reimbursements, and billed supplemental insurance programs for the portions of the claims not paid by Medicare. See e.g., GX. 505.5 (Statement from BlueCross Blue Shield), GX. 507.13, 508, and 508.7 (Statements

from The Empire Plan); GX. 513, 616, and 617 (showing defendant's handwritten instructions concerning the resubmission of claims). As Probation aptly noted, the defendant "may well have known that Medicare would not reimburse the full amount of his fraudulent claims, but his true intentions, indeed his true expectations, are laid bare by the full picture of his fraudulent billing activities – activities which involved more than just Medicare and which are considered relevant conduct to the instant case." See Addendum to the Presentence Report at "Loss Determination and Related Guideline Calculations."

B.    Abuse of a Position of Trust

Section 3B1.3 of the Guidelines provides that "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by two levels." Id. The Second Circuit has upheld district courts' applications of the abuse of position of trust enhancement for doctors under § 3B1.3. See, e.g., United States v. Wright, 160 F.3d 905, 910 (2d Cir. 1998); United States v. Ntshona, 156 F.3d 318, 321 (2d Cir. 1998) ("We adopt the view of the other circuits presented with this issue and hold that a doctor convicted of using her position to commit Medicare fraud is involved in a fiduciary relationship with her patients and the government and hence is subject to an enhancement under § 3B1.3").

As noted in the PSR at ¶ 27, the adjustment for abuse of a position of trust applies to the defendant because he was a medical doctor who used his medical license and Medicare billing privileges in the commission of the offense.

III.    A Sentence of Incarceration at or Above the Guidelines Range Is Appropriate

A.    Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, but made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). The Second Circuit cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the judge] may not presume that the Guidelines range is reasonable. [The judge] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

B.      Application of 18 U.S.C. § 3553(a) Factors

The government respectfully submits that the Court should impose a sentence at or above the advisory Guidelines range of imprisonment because such a sentence is appropriate to account for the "nature and circumstances of the offense" and to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(1)-(2)(A).  A sentence at or above that range will also promote general deterrence.  See id. at § 3553(a)(2)(B).

Health care fraud is a serious offense that targets a national program relied on by millions of Americans.  Congress aptly summarized the effects of the defendant's crime over thirty years ago:

> In whatever form it is found . . . fraud in these health care financing programs adversely affects all Americans.  It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program.  It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

H.R. 95-393, pt. II, at 44 (1977).  See also H.R. Rep. 104-747 (1996) ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures.").

The defendant's story is one of greed and dishonesty.  The defendant intended to steal over $85 million from Medicare, a U.S. taxpayer funded government program designed to provide health care to elderly and disabled Americans.  Medicare is a trust-based system that relies on doctors to be a steward of the program's funds.  The defendant betrayed that trust by billing Medicare for surgeries he did not perform and his three-year long fraud cost the Medicare program over $7 million.

The defendant, a medical doctor who completed medical school and two residencies, was recognized as a skilled surgeon by his colleagues and mentors.  Instead of using his training as a doctor to make an honest living while helping others, the defendant chose to abuse the trust that our society places in medical doctors by plundering a public health care program of millions of dollars.  The defendant's offense conduct was not a short-lived lapse in judgment, or a youthful indiscretion, but rather was a conscious course of conduct performed over several years.  Each and every day the defendant scoured hospitals for medical charts of elderly patients whom he could use to bill Medicare for surgeries.  Each time he found one, the defendant left an illegible note in the chart, copied the face sheet, handwrote CPT codes on the face sheet, and sent the face sheet to be billed to Medicare.   His actions were conscious, deliberate, pre-meditated efforts over the course of three years to enrich himself at the expense of others – exactly the kind of crime our system of justice is designed to punish.  The defendant preyed upon the elderly and disabled Americans in order to maximize his profits.  A sentence at or above the guidelines would correspond to the nature and circumstances of the offense, the

8

history and characteristics of the defendant while reflecting the serious nature of the offense.

The need for general deterrence also weighs heavily in favor of a sentence within or above the Guidelines range. 18 U.S.C. § 3553(a)(2)(B) and (C). Fraud schemes like the defendant's are typically difficult to detect and prosecute, so there is a greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Congress recognized the need to afford adequate deterrence as "particularly important in the area of white collar crime" when it adopted Section 3553. See S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress rightly was disturbed that "white collar criminals often are sentenced to small fines and little or no imprisonment," and noted that, "[u]nfortunately, this creates the impression that certain offenses . . . can be written off as a cost of doing business." Id. In adopting the Section 3553 sentencing factors, Congress emphasized the essential deterrent value of imprisoning white collar criminals, even when those criminals themselves might be unlikely to reoffend:

> The Committee is of the view that in the past there have been many cases, particularly in the instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a white collar criminal] . . . may be grossly inappropriate . . . in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

Id. at 91-92.

The defendant's punishment should take into account the need to deter other doctors from stealing from the Medicare program. Health care fraud is a serious problem that

has warranted national law enforcement attention.  Although federal law provides significant periods of incarceration for those who steal from these programs, this fraud continues at alarmingly high rates.  In determining a just sentence, the Court should consider the need to promote respect for the criminal fraud laws.  Here, a sentence at or above the Guidelines range will serve to deter doctors, and other medical professionals, who, like the defendant, may be tempted to place their financial interests above all else.

IV.     Disruption of a Governmental Function

The government recognizes that resolution of the dispute on the appropriate loss amount (i.e., the amount billed to Medicare or the amount paid by Medicare) bears significantly on the defendant's Guidelines range.  Even if the Court were to conclude the amount paid to the defendant by Medicare is the appropriate measure of loss and find a Guidelines range lower than the calculations provided by Probation and the government, there is ample basis to depart upwardly here and courts have recognized "disruption of a governmental function" as an appropriate basis on which to do so.  The Court may sentence the defendant to a term of imprisonment that exceeds the high end of the Guideline's range because the defendant's conduct resulted in a significant disruption of a governmental function, the Medicare program.  U.S.S.G. Policy Statement § 5K2.7 provides as follows: "If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected."

The Second Circuit has upheld the application of upward departures under § 5K2.7 for health care fraud defendants.  See United States v. Khan, 53 F.3d 507, 518 (2d Cir. 1995) (upholding application of § 5K2.7 in $8 million Medicare fraud scheme, and opining, "the scheme not only disrupted the government's function of efficiently administering Medicaid, but also undermined the public's confidence in government."); see also United States v. Regueiro, 240 F. 3d 1321, 1324 (11th Cir. 2001) (per curiam) (holding that the significant disruption departure was properly applied to a fraudulent billing scheme where Medicare lost $15 million and explaining "[e]very time [a defendant defrauds] Medicare, the government los[es] funds that it otherwise could have used to provide medical care to eligible Medicare patients."); United States v. Duran, Case No. 11-14429 at 18-20 (11th Cir., Feb. 25, 2013) (unpublished opinion) (holding that the district court did not err in applying the significant departure was appropriate because "the amount of money left in the pot for the legitimate care of our neediest citizens dwindles with each dollar the program pays out to the criminals . . . who seek to defraud it" and that the defendant's argument that it was not a disruption bordered on frivolity when the defendant defrauded Medicare through "a concerted scheme of fraudulent billing, appealing every claim denied, and concealment of the fraud.")

Similarly, the Court in the instant case can upwardly depart from the Guidelines because the defendant caused a disruption to a government function by receiving approximately $7 million after billing Medicare over $85 million via a deliberate pattern of fraudulent billing using the 11 CPT Codes and Modifier 78.

V.     Restitution

Restitution is mandatory in this case pursuant to the Mandatory Victim Restitution Act, codified at 18 U.S.C. § 3663A.  See also U.S.S.G. § 5E1.1.  Restitution is owed

the victim, Medicare, in the amount of $7,266,008.95, the amount that Medicare paid the defendant for fraudulent claims.  See PSR ¶ 79, as amended by the Addendum to the Presentence Report at "Loss Determination and Related Guideline Calculations."

VI.     Forfeiture

        The government requests an order of forfeiture in the amount of $7,266,008.95, the total amount of Class I, Class II and Class III claims.  In its Post Trial Order, the Court has already found that the defendant is liable for and must forfeit at least $3,090,044.10, the total amount of Class I and Class II Claims.  For the reasons set forth in the government's submissions dated September 1, 2017 and October 30, 2017, the government requests forfeiture in the amount of $7,266,008.95.

VII.    Conclusion

        For the foregoing reasons, the government respectfully requests that the Court sentence the defendant principally to a term of imprisonment at or above the Guidelines range of 188 to 235 months' and a three-year term of supervised release.  Restitution is mandatory in the amount of Medicare's loss of $7,266,008.95.

                                        Respectfully submitted,

                                        BRIDGET M. ROHDE
                                        Acting United States Attorney

                        By:     _____/s/_____
                                        F. Turner Buford
                                        Patricia A. Notopoulos
                                        Assistant United States Attorneys
                                        (718) 254-6483/6354

                                        Debra Jaroslawicz
                                        Trial Attorney
                                        U.S. Department of Justice
                                        Criminal Division, Fraud Section
                                        (718) 254-6377

cc:     Clerk of the Court (By ECF)
        Defense Counsel of Record (By ECF and Email)
        Frank Marcigliano, U.S. Probation Officer (by Email)